# WEEKS *v.* ANGELONE, DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS

No. 99–5746.   Argued December 6, 1999—Decided January 19, 2000

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, and in which SOUTER, J., joined with respect to all but Part I, *post*, p. 237.

*Mark Evan Olive* argued the cause for petitioner. With him on the briefs were *Glen A. Huff, Timothy M. Richardson,* and *Sterling H. Weaver.*

*Robert H. Anderson III*, Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief was *Mark L. Earley*, Attorney General.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents the question whether the Constitution is violated when a trial judge directs a capital jury's attention to a specific paragraph of a constitutionally sufficient instruction in response to a question regarding the proper consideration of mitigating circumstances. We hold that it is not and that habeas relief is barred by 28 U. S. C. § 2254(d) (1994 ed., Supp. III).

Petitioner Lonnie Weeks, Jr., was riding from Washington, D. C., to Richmond, Virginia, as a passenger in a car driven by his uncle, Lewis Dukes. Petitioner had stolen the vehicle in a home burglary earlier in the month. The two sped past the marked car of Virginia State Trooper Jose Cavazos, who was monitoring traffic. Trooper Cavazos activated his emergency lights and took chase. After passing other vehicles on the highway shoulder, Dukes stopped on an exit ramp. Trooper Cavazos approached the driver's side of the stolen vehicle on foot. Upon the trooper's request, Dukes alighted and stood near the rear of the car. Trooper Cavazos, still standing near the driver's side, asked petitioner to step out as well. As Weeks stepped out on the passenger's side, he carried a 9-millimeter semiautomatic pistol loaded with hollow-point bullets. Petitioner proceeded to fire six bullets at the trooper, two of which entered his body near the right and left shoulder straps of his protective vest, and four of which entered his forearms and left wrist. Trooper Cavazos died within minutes.

Petitioner was arrested the next morning. During routine questioning about his physical and mental state by clas-

---

*\*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

sification officers, petitioner confessed, indicating that he was considering suicide because he shot the trooper. Petitioner also voluntarily wrote a letter to a jail officer admitting the killing and expressing remorse.

Petitioner was tried in the Circuit Court for Prince William County, Virginia, in October 1993. After the jury had found him guilty of capital murder, a 2-day penalty phase followed. In this proceeding the prosecution sought to prove two aggravating circumstances: that Weeks "would commit criminal acts of violence that would constitute a continuing serious threat to society" and that his conduct was "outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery." App. 192. During the penalty phase, the defense presented 10 witnesses, including petitioner, in mitigation.

The jury retired at 10:40 a.m. on the second day to begin deliberations. At around noon, the judge informed counsel that the jury had asked the following question:

> "Does the sentence of life imprisonment in the State of Virginia have the possibility of parole, and if so, under what conditions must be met to receive parole?" App. to Pet. for Cert. 90.

The judge responded to the jury's question as follows:

> "You should impose such punishment as you feel is just under the evidence, and within the instructions of the Court. You are not to concern yourselves with what may happen afterwards." *Ibid.*

The prosecution agreed with the judge's response and defense counsel objected. At 12:40 p.m., court reconvened and the judge told the jurors that there would be a 1-hour luncheon recess and that they could go to lunch or continue deliberations, as a juror had apparently informed the bailiff that they might be interested in working through lunch. At 12:45 p.m., the jury retired from the courtroom. At 3:15

p.m., the judge informed counsel that he had received the following written question from the jury:

> "If we believe that Lonnie Weeks, Jr. is guilty of at least 1 of the alternatives, then is it our duty as a jury to <u>issue</u> the death penalty?   Or must we <u>decide</u> (even though he is guilty of one of the alternatives) whether or not to issue the death penalty, or one of the life sentences? What is the Rule?   Please clarify?" *Id.*, at 91 (emphasis in original).

The judge wrote the following response: "See second paragraph of Instruction #2 (Beginning with 'If you find from . . .')." *Ibid.* The judge explained to counsel his answer to the jury's question:

> "In instruction number 2 that was given to them, in the second paragraph, it reads, 'If you find from the evidence that the Commonwealth has proved, beyond a reasonable doubt, either of the two alternatives, and as to that alternative, you are unanimous, then you may fix the punishment of the defendant at death, or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at imprisonment for life, or imprisonment for life with a fine not to exceed $100,000.'
>
> "I don't believe I can answer the question any clearer than the instruction, so what I have done is referred them to the second paragraph of instruction number 2, and I told them beginning with, 'if you find from,' et cetera, et cetera, for them to reread that paragraph."[1] App. 222–223.

---

[1] Instruction No. 2, in its entirety, read:

"You have convicted the defendant of an offense which may be punished by death.   You must decide whether the defendant shall be sentenced to death or to imprisonment for life or to imprisonment for life and a fine of a specific amount, but not more than $100,000.00.   Before the penalty can

The prosecution stated that the judge's solution was appropriate. Defense counsel disagreed, and stated:

> "Your Honor, we would ask that Your Honor instruct the jury that even if they find one or both of the mitigating factors—I'm sorry, the factors that have been proved beyond a reasonable doubt, that they still may impose a life sentence, or a life sentence plus a fine." *Id.*, at 223.

Defense counsel asked that his objection be noted.

More than two hours later, the jury returned. The clerk read its verdict:

> "[W]e the jury, on the issue joined, having found the defendant Lonnie Weeks, Jr., guilty of capital murder, and having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhumane, in that it involved depravity of mind and or aggravated battery, *and having considered the evidence in mitigation of the offense,* unanimously fix

---

be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:

"1. That, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or

"2. That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

"If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the two alternatives, and as to that alternative you are unanimous, then you may fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is not justified, then you shall fix the punishment of the defendant at life imprisonment or imprisonment for live [sic] and a fine of a specific amount, but not more than $100,000.00.

"If the Commonwealth has failed to prove beyond a reasonable doubt at least one of the alternatives, then you shall fix the punishment of the defendant at life imprisonment or imprisonment for live [sic] and a fine of a specific amount, but not more than $100,000.00." App. 192–193.

his punishment at death . . . ." *Id.*, at 225 (emphasis added).

The jurors were polled and all responded affirmatively that the foregoing was their verdict in the case.

Petitioner presented 47 assignments of error in his direct appeal to the Virginia Supreme Court, and the assignment of error respecting the judge's answering the jury's question about mitigating circumstances was number 44. The Virginia Supreme Court affirmed petitioner's conviction and sentence, holding that the claims petitioner advances here lack merit. *Weeks* v. *Virginia*, 248 Va. 460, 465–466, 476–477, 450 S. E. 2d 379, 383, 390 (1994), cert. denied, 516 U. S. 829 (1995). The Virginia Supreme Court dismissed petitioner's state habeas petition as jurisdictionally barred on timeliness grounds. The District Court denied petitioner's request for federal habeas relief, and the Court of Appeals for the Fourth Circuit denied a certificate of appealability and dismissed his petition. 176 F. 3d 249 (1999). We granted certiorari, 527 U. S. 1060 (1999), and now affirm.

Petitioner relies heavily on our decisions in *Bollenbach* v. *United States*, 326 U. S. 607 (1946), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982). *Bollenbach* involved a supplemental instruction by the trial court following an inquiry from the jury—in that respect it is like the present case—but the instruction given by the trial court in *Bollenbach* was palpably erroneous. 326 U. S., at 611. In this respect it is quite unlike the present case. *Eddings* arose out of a bench trial in a capital case, and this Court reversed a sentence of death because the trial judge had refused to consider mitigating evidence: "[I]t was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf." 455 U. S., at 114.

Here the trial judge gave no such instruction. On the contrary, he gave the instruction that we upheld in *Buchanan* v. *Angelone*, 522 U. S. 269 (1998), as being sufficient to allow the jury to consider mitigating evidence. And in

addition, he gave a specific instruction on mitigating evidence—an instruction that was not given in *Buchanan*—in which he told the jury that "[y]ou must consider a mitigating circumstance if you find there is evidence to support it." [2] Even the dissenters in *Buchanan* said that the ambiguity that they found in the instruction there given would have been cleared up by "some mention of mitigating evidence anywhere in the instructions." *Id.*, at 283.

In *Buchanan*, we considered whether the Eighth Amendment required that a capital jury be instructed on particular mitigating factors. Buchanan's jury was given precisely the same Virginia pattern capital instruction that was given to Weeks' jury. See *id.*, at 272, and n. 1. We noted that our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence, and that the State may structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it. *Id.*, at 276. We further noted that the "standard for determining whether jury instructions satisfy these principles was 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evi-

---

[2] That instruction was titled "EVIDENCE IN MITIGATION" and stated in full:

"Mitigation evidence is not evidence offered as an excuse for the crime of which you have found defendant guilty. Rather, it is any evidence which in fairness may serve as a basis for a sentence less than death. The law requires your consideration of more than the bare facts of the crime.

"Mitigating circumstances may include, but not be limited to, any facts relating to defendant's age, character, education, environment, life and background, or any aspect of the crime itself which might be considered extenuating or tend to reduce his moral culpability or make him less deserving of the extreme punishment of death.

"You must consider a mitigating circumstance if you find there is evidence to support it. The weight which you accord a particular mitigating circumstance is a matter of your judgment." *Id.*, at 195.

dence.'" *Ibid.* (quoting *Boyde* v. *California,* 494 U. S. 370, 380 (1990)). But we stated that we have never held that the State must structure in a particular way the manner in which juries consider mitigating evidence. 522 U. S., at 276. We concluded that the Virginia pattern jury instruction at issue there, and again at issue here, did not violate those principles:

> "The instruction did not foreclose the jury's consideration of any mitigating evidence. By directing the jury to base its decision on 'all the evidence,' the instruction afforded jurors an opportunity to consider mitigating evidence. The instruction informed the jurors that if they found the aggravating factor proved beyond a reasonable doubt then they 'may fix' the penalty at death, but directed that if they believed that all the evidence justified a lesser sentence then they 'shall' impose a life sentence. The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved." *Id.,* at 277.

But, as noted above, the jury in this case also received an explicit direction to consider mitigating evidence—an instruction that was not given to the jury in *Buchanan.* Thus, so far as the adequacy of the jury instructions is concerned, their sufficiency here follows *a fortiori* from *Buchanan.*[3]

---

[3] JUSTICE STEVENS attempts to distinguish the instruction given here from that given in *Buchanan* v. *Angelone,* 522 U. S., at 272, n. 1, on the basis that the first paragraph of the "Weeks instructions contain[s] a longer description" of the aggravating circumstances. *Post,* at 239 (dissenting opinion). The first paragraph is longer here because the prosecution in *Buchanan* sought to prove only one aggravating circumstance. See 522 U. S., at 271. The mere addition of the description of another aggravating circumstance in the first paragraph, however, does not at all affect the second clause of the second paragraph of the instruction—the clause that JUSTICE STEVENS finds "ambiguous." *Post,* at 241.

More importantly, JUSTICE STEVENS, after stating that his "point is best made by quoting the instruction itself," *post,* at 239, fails to quote

Given that petitioner's jury was adequately instructed, and given that the trial judge responded to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, the question becomes whether the Constitution requires anything more. We hold that it does not.

A jury is presumed to follow its instructions. *Richardson* v. *Marsh*, 481 U. S. 200, 211 (1987). Similarly, a jury is presumed to understand a judge's answer to its question. See, *e. g., Armstrong* v. *Toler*, 11 Wheat. 258, 279 (1826) (opinion of Marshall, C. J.). Weeks' jury did not inform the court that after reading the relevant paragraph of the instruction, it still did not understand its role. See *ibid.* ("Had the jury desired further information, they might, and probably would, have signified their desire to the court. The utmost willingness was manifested to gratify them, and it may fairly be presumed that they had nothing further to ask"). To presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer.

Here the presumption gains additional support from several empirical factors. First and foremost, each of the jurors affirmed in open court the verdict which included a finding that they had "considered the evidence in mitiga-

---

the third paragraph of the instruction, *post*, at 239–240. That paragraph expressly applies when the jury finds that the prosecution failed to prove either aggravating circumstance. Specifically, it instructs that if the jury finds no aggravating circumstances, then it must impose a life sentence. See n. 1, *supra*. The third paragraph stands in contrast to the second paragraph, which expressly applies when the jury finds that the prosecution proved one or both of the aggravating circumstances. The second paragraph offers the jury the option of imposing whichever sentence— death or life imprisonment—it feels is justified in that situation. The existence of the third paragraph makes the function of the second paragraph even clearer.

tion of the offense."[4]   App. 225.   It is also significant, we think, that the jurors deliberated for more than two hours after receiving the judge's answer to their question.   Over 4½ hours after the jury retired to begin deliberations, the jury asked the question at issue.   Again, the question was:

"If we believe that Lonnie Weeks, Jr. is guilty of at least 1 of the alternatives, then is it our duty as a jury to issue the death penalty?   Or must we decide (even though he is guilty of one of the alternatives) whether or not to issue the death penalty, or one of the life sentences?   What is the Rule?   Please clarify?"   App. to Pet. for Cert. 91 (emphasis in original).

The question indicates that at the time it was asked, the jury had determined that the prosecution had proved one of the two aggravating factors beyond a reasonable doubt.   More than two hours passed between the judge directing the jury's attention to the appropriate paragraph of the instruction that answered its question and the jury returning its verdict. We cannot, of course, know for *certain* what transpired during those two hours.   But the most likely explanation is that the jury was doing exactly what it was instructed to do: that is, weighing the mitigating circumstances against the aggravating circumstance that it found to be proved beyond a reasonable doubt.   If, after the judge's response to its question, the jury thought that it was required to give the death penalty upon finding of an aggravating circumstance, it is unlikely that the jury would have consumed two more hours in deliberation.   This particular jury demonstrated that it was

[4] JUSTICE STEVENS' arguments concerning the lack of a jury verdict form stating that the jury finds one or both aggravating circumstances and sentences the petitioner to life imprisonment miss the mark.   The life sentence verdict forms do not suggest that a prerequisite for their use is that the jury found no aggravating circumstances.   See *post*, at 246, n. 8. In any event, the claim here is that the trial judge's response to the jury's question was constitutionally insufficient, not that the jury verdict forms were unconstitutionally ambiguous.

not too shy to ask questions, suggesting that it would have asked another if it felt the judge's response unsatisfactory. Finally, defense counsel specifically explained to the jury during closing argument that it could find both aggravating factors proven and still not sentence Weeks to death. Thus, once the jury received the judge's response to its question, it had not only the text of the instruction we approved in *Buchanan*, but also the additional instruction on mitigation, see n. 2, *supra*, and its own recollection of defense counsel's closing argument for guidance. At best, petitioner has demonstrated only that there exists a slight *possibility* that the jury considered itself precluded from considering mitigating evidence. Such a demonstration is insufficient to prove a constitutional violation under *Boyde*, which requires the showing of a reasonable *likelihood* that the jury felt so restrained.[5] See 494 U. S., at 380.

It also appears that petitioner's attorneys did not view the judge's answer to the jury's question as a serious flaw in the trial at that time. Petitioner's attorney made an oral

---

[5] JUSTICE STEVENS states that the record establishes a "virtual certainty" that the jury did not understand that it could find an aggravating circumstance and still impose a life sentence. *Post*, at 238. In view of the different conclusion reached not only by this Court, but by the Virginia trial judge, seven justices of the Supreme Court of Virginia, a federal habeas District Judge, and three judges of the Court of Appeals for the Fourth Circuit, this statement can only be described as extravagant hyperbole.

The dissent also interprets the evidence of the jurors being in tears at the time of the verdict as resulting from having performed what they thought to be their "duty under the law" despite their "strong desire" to impose the life sentence. *Post*, at 249. It is difficult enough to speculate with confidence about the deliberations of jurors in a case such as this, and still more difficult to speculate about their emotions at the time they render a verdict. But if we were to join in this speculation, it is every bit as plausible—if not more so—to think that the reason that jurors were in tears was because they had just been through an exhausting, soul-searching process that led to a conclusion that petitioner, despite the mitigating evidence he presented, still deserved the death sentence.

motion to set aside the sentence after the verdict of death was received, and did not even mention this incident in his motion. And the low priority and space which his counsel assigned to the point on his appeal to the Supreme Court of Virginia suggests that the present emphasis has some of the earmarks of an afterthought.

Because petitioner seeks a federal writ of habeas corpus from a state sentence, we must determine whether 28 U. S. C. §2254(d) (1994 ed., Supp. III) precludes such relief. The Court of Appeals below held that it did. 176 F. 3d, at 261. We agree. Section 2254(d) prohibits federal habeas relief on any claim "adjudicated on the merits in State court proceedings," unless that adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §§2254(d) and (1) (1994 ed., Supp. III). For the reasons stated above, it follows *a fortiori* that the adjudication of the Supreme Court of Virginia affirming petitioner's conviction and sentence neither was "contrary to," nor involved an "unreasonable application of," any of our decisions.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, and with whom JUSTICE SOUTER joins with respect to all but Part I, dissenting.

Congress has directed us to apply "clearly established Federal law" in the exercise of our habeas corpus jurisdiction.[1] The clearly established rule that should govern the disposition of this case also emphasizes the importance of

---

[1] The habeas statute, as amended in 1996, authorizes the issuance of the writ if a state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. §2254(d)(1) (1994 ed., Supp. III).

clarity—clarity in the judge's instructions when there is a reasonable likelihood that the jury may misunderstand the governing rule of law. In this case, as in *Boyde* v. *California*, 494 U. S. 370, 380 (1990), we are confronted with a claim that an instruction, though not erroneous, is sufficiently ambiguous to be "subject to an erroneous interpretation." In *Boyde*, we held that "the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Ibid.*

The record in this case establishes, not just a "reasonable likelihood" of jury confusion, but a virtual certainty that the jury did not realize that there were two distinct legal bases for concluding that a death sentence was not "justified." The jurors understood that such a sentence would not be justified unless they found at least one of the two alleged aggravating circumstances. Despite their specific request for enlightenment, however, the judge refused to tell them that *even if* they found one of those circumstances, they did not have a "duty as a jury to <u>issue</u> the death penalty." App. 217.

Because the Court creatively suggests that petitioner's claim has "the earmarks of an afterthought," *ante*, at 237, it is appropriate to note that his trial counsel specifically and repeatedly argued that both the instructions and the verdict forms were inadequate because " 'the jury has to be instructed that . . . even if they find the aggravating factors beyond a reasonable doubt, . . . they can still give effect to the evidence in mitigation by sentencing the defendant to life, as opposed to death.' " App. 178. See also *id.*, at 179, 180, 185–186, 223.

Four different aspects of the record cumulatively provide compelling support for the conclusion that this jury did not understand that the law authorized it "not to issue the death penalty" even though it found petitioner "guilty

of at least 1" aggravating circumstance. *Id.*, at 217. Each of these points merits separate comment: (1) the text of the instructions; (2) the judge's responses to the jury's inquiries; (3) the verdict forms given to the jury; and (4) the court reporter's transcription of the polling of the jury.

## I

Because the prosecutor in this case relied on two separate aggravating circumstances, the critical instruction given in this case differed from that given and upheld by this Court in *Buchanan* v. *Angelone*, 522 U. S. 269 (1998). The Weeks instructions contain a longer description of the ways in which the jury would be justified in imposing the death penalty; this made it especially unlikely that the jury would understand that it could lawfully impose a life sentence by either (1) refusing to find an aggravator, or (2) concluding that even if it found an aggravator, the mitigating evidence warranted a life sentence. The point is best made by quoting the instruction itself:

> " 'Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt, at least one of the following two alternatives: one, that, after consideration of his history and background, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or two; that his conduct in committing the offense was outrageously or wantonly vile, horrible, or inhumane, in that it involved depravity of mind and aggravated battery to the victim, beyond the minimum necessary to accomplish the act of murder.
>
> " 'If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt, either of the two alternatives, and as to that alternative you are unanimous, then you may fix the punishment of the defendant at death; or, if you believe from all the evidence that the death penalty is not justified, then you shall fix

the punishment of the defendant at life imprisonment, or imprisonment for life and a fine of a specific amount, but not more than $100,000.'" App. 199–200.

The first paragraph and the first half of the second are perfectly clear. They unambiguously tell the jury: "In order to justify the death penalty, you must find an aggravating circumstance."[2] The second clause in the second paragraph is, however, ambiguous. It could mean either:

(1) "even if you find one of the two aggravating alternatives, if you believe from all the evidence that the death penalty is not justified because the mitigating evidence outweighs the aggravating evidence, then you shall fix the punishment [at life]"; or

(2) "if you believe from all the evidence that the death penalty is not justified because neither of the aggravating circumstances has been proven beyond a reasonable doubt, then you shall fix the punishment [at life]."

It is not necessary to reiterate JUSTICE BREYER's reasons for believing that the latter message is the one a nonlawyer would be most likely to receive. See *Buchanan*, 522 U. S., at 281–284 (dissenting opinion). Nor is it necessary to disagree with the Court's view in *Buchanan* that trained lawyers and logicians could create a "simple decisional tree" that would enable them to decipher the intended meaning of the instruction, see *id.*, at 277–278, n. 4, to identify a serious risk that this jury failed to do so.

That risk was magnified by the fact that the instructions did not explain that there were two reasons why mitigating evidence was relevant to its penalty determination. The instructions did make it clear that mitigating evidence concerning the history and background of the defendant should

---

[2] That message was reiterated later in the instructions, see *ante*, at 229–230, n. 1; *ante*, at 233–234, n. 3. Reiterating what has already been clearly stated does not serve to clarify an ambiguous statement.

be considered when deciding *whether* either aggravating circumstance had been proved. The instructions did not, however, explain that mitigating evidence could serve another purpose—to provide a lawful justification for a life sentence *even if* the jury found at least one aggravating circumstance. Indeed, given the fact that the first task assigned to the jury was to decide whether *"after consideration of his history and background,* there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society," App. 192–193 (emphasis added), it would have been reasonable for the jury to infer that his history and background were only relevant to the threshold question whether an aggravator had been proved. It is of critical importance in understanding the jury's confusion that the instructions failed to inform the jury that mitigating evidence serves this dual purpose.

## II

The jurors had a written copy of the judge's instructions with them in the jury room during their deliberations. The fact that the jurors submitted the following written inquiry to the trial judge after they had been deliberating for several hours demonstrates both that they were uncertain about the meaning of the ambiguous clause that I have identified, and that their uncertainty had not been dissipated by their recollection of anything said by counsel.

> "If we believe that Lonnie Weeks, Jr., is guilty of at least 1 of the alternatives, then is it our duty as a jury to issue the death penalty? Or must we decide (even though he is guilty of one of the alternatives) whether or not to issue the death penalty, or one of the life sentences? What is the Rule? Please clarify." *Id.,* at 217.

The only portion of the written instructions that could possibly have prompted this inquiry is the second half of the

second paragraph of the instruction quoted above. The fact that the jurors asked this question about that instruction demonstrates beyond peradventure that the instruction had confused them. There would have been no reason to ask the question if they had understood the instruction to authorize a life sentence even though they found that an aggravator had been proved.

Although it would have been easy to do so, the judge did not give the jurors a straightforward categorical answer to their simple question; he merely told them to reexamine the portion of the instructions that they, in effect, had already said they did not understand. The text of their question indicates that they believed that they had a duty "to issue the death penalty" if they believed that "Weeks . . . is guilty of at least 1 of the alternatives." *Ibid.* Without a simple, clear-cut statement from the judge that that belief was incorrect, there was surely a reasonable likelihood that they would act on that belief.[3]

Instead of accepting a commonsense interpretation of the colloquy between the jury and the judge, the Court first relies on a presumption that the jury understood the instruction (a presumption surely rebutted by the question itself),

---

[3] The Court suggests this likelihood is impossible in part because, even if the jury were confused by the judge's response, it had not only the text of the instruction but also the benefit of defense counsel's oral argument, in which counsel averred that the jury could award a life sentence even if it found an aggravating factor. See *ante,* at 236. But this statement by counsel, coming as it did, of course, before the jury began deliberations, apparently did not prevent the jury from asking the question in the first place. Moreover, as this Court wisely noted in *Boyde* v. *California,* 494 U. S. 370, 384 (1990): "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (Citing cases; citation omitted.)

*ante*, at 234–236, and then presumes that the jury must have understood the judge's answer because it did not repeat its question after re-reading the relevant paragraph, and continued to deliberate for another two hours. But if the jurors found it necessary to ask the judge what that paragraph meant in the first place, why should we presume that they would find it any less ambiguous just because the judge told them to read it again? It seems to me far more likely that the reason they did not ask the same question a second time is that the jury believed that it would be disrespectful to repeat a simple, unambiguous question that the judge had already refused to answer directly. The fact that it had previously asked the judge a different question—also related to the effect of a sentencing decision, App. 217—that he had also refused to answer would surely have tended to discourage a repetition of the question about the meaning of his instructions.[4]

By the Court's logic, a rather exceptionally assertive jury would have to question the judge at least twice and maybe more on precisely the same topic before one could find it no more than "reasonably likely" that the jury was confused.[5]

---

[4] The Court relies on Chief Justice Marshall's opinion in *Armstrong* v. *Toler*, 11 Wheat. 258, 279 (1826), as support for its presumption that the jury's failure to repeat its question indicates that it understood the judge's answer. In that case, however, it was the jury's question that was arguably unclear; the Court merely assumed that "the jury could not have intended to put a question which had been already answered." In this case, in contrast, there is no mystery about what the jury wanted to know; the mystery is why the trial judge was unable or unwilling to give it a direct answer.

[5] The Court seeks to justify its reliance on the improbable presumption that the jury correctly deciphered the judge's ambiguous answer to its straightforward question by pronouncing: "To presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Ante*, at 234. For two obvious reasons that is not so. First, a simple, direct answer to the jury's question would have avoided the error. Second, clearly established law

But given the Court's apt recognition that we cannot, of course, actually know what occupied the jury during its final deliberations, *ante*, at 235, and in light of the explanation I have just offered, it is at the very least equally likely that the two hours of deliberation following the judge's answer were devoted to continuing debate about the *same* instruction, as they were to weighing aggravating and mitigating evidence (having been magically satisfied by the repetition of the instruction that had not theretofore answered its question).

When it comes to the imposition of the death penalty, we have held repeatedly that justice and " 'the fundamental respect for humanity underlying the Eighth Amendment' " require jurors to give full effect to their assessment of the defendant's character, circumstances, and individual worth. *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982). In this context, even if one finds the explanations of the jury's conduct here in equipoise, a 50–50 chance that the jury has not carried out this mandate seems to me overwhelming grounds for reversal.

Other than the Court's reliance on inapplicable presumptions and speculation, there is no reason to believe that the jury understood the judge's answer to its question. As we squarely held in *Boyde*, the "defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction" to satisfy the clearly established "reasonable likelihood" standard. 494 U. S., at 380. The Court's application of that standard in this case effectively drains it of meaning.

---

requires that the issue be resolved, not on the basis of a presumption that flows from the positing of any single question, but by deciding whether, under all of the circumstances, there was a "reasonable likelihood" that the jury was confused as to the relevance of mitigating evidence in its decision. The Court's fear of constant reversal in this regard is thus vastly overstated.

## III

The judge provided the jury with five verdict forms, three of which provided for the death penalty and two for a life sentence. Three death forms were appropriate because the death penalty might be justified by a finding that the first, the second, or both aggravating circumstances had been proved. One would expect the two life forms to cover the two alternatives, first that no aggravator had been proved, and second that despite proof of at least one aggravator, the mitigating circumstances warranted a life sentence. But that is not why there were two forms; neither referred to the possibility of a life sentence if an aggravator had been proved. Rather, the two life alternatives merely presented the jury with a choice between life plus a fine and a life sentence without a fine.

The first form read as follows:

> "We, the jury, on the issue joined, having found the defendant, LONNIE WEEKS, JR., GUILTY of CAPITAL MURDER and having unanimously found after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society, and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death." App. 196.

The jury ultimately refused to select this first form, which would have indicated a finding that there was a probability that petitioner would commit additional crimes that would constitute a serious threat to society. In doing so, it unquestionably gave weight to the unusually persuasive mitigating evidence offered by the defense—evidence that included not only petitioner's personal history but his own testimony describing the relevant events and his extreme remorse. As I explained above, the fact that the jury recognized the relevance of the mitigating "history and back-

ground" evidence to the question whether the aggravator had been proved sheds no light on the question whether it understood that such evidence would also be relevant on the separate question whether a life sentence would be appropriate even if Weeks was "guilty of at least 1 of the alternatives." *Id.*, at 217.

The jury's refusal to find that petitioner would constitute a continuing threat to society also explains why it did not use the second form, which covered the option of a death penalty supported by both aggravators.[6] The choice then, was between the third alternative, which included a finding that the second aggravator had been proved,[7] and the fourth or fifth alternatives, neither of which included any such finding.[8] Despite the fact that trial counsel had expressly

---

[6] That form read as follows: "We, the jury, on the issue joined, having found the defendant, LONNIE WEEKS, JR., GUILTY of CAPITAL MURDER and having unanimously found after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious treat [sic] to society, and having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and/or aggravated battery and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death." App. 196–197.

[7] This form, the one ultimately filed by the jury, read: "We, the jury, on the issue joined, having found the defendant, LONNIE WEEKS, JR., GUILTY of CAPITAL MURDER and having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and/or aggravated battery and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death." *Id.*, at 228.

[8] The fourth form read: "We, the jury, on the issue joined, having found the defendant, LONNIE WEEKS, JR., GUILTY of CAPITAL MURDER and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life." *Id.*, at 197–198. The fifth form was identical except for providing that Weeks' punishment was to be fixed "at imprisonment for life and a fine" for an amount to be filled in by the jury. *Id.*, at 198.

objected to the verdict forms because they "do not expressly provide for a sentence of life imprisonment, upon finding beyond a reasonable doubt, on one or both of the aggravating factors," *id.*, at 185–186, the judge failed to use forms that would have answered the question that the jury asked during its deliberations.

The ambiguity of the forms also helps further explain why the Court is wrong in its speculation as to the jury's final hours of deliberation following the judge's response to its question. The Court postulates that before the jury asked whether it had a duty to issue the death penalty "[i]f we believe that Lonnie Weeks, Jr. is guilty of at least 1 of the alternatives," the jury had already so decided. Thus, the remaining hours of deliberation must have been spent weighing the mitigating circumstances against the aggravating circumstance. *Ante*, at 235. Of course, the text of the question, which used the word "if" rather than the word "since," does not itself support that speculation. More important, however—inasmuch as we cannot know for certain what transpired during those deliberations—is the fact that after it eliminated the first two verdict options, the remaining forms identified a choice between a death sentence based on a guilty finding on "1 of the alternatives" and a life sentence without any such finding. In my judgment, it is thus far more likely that the conscientious jurors were struggling with the question whether the mitigating evidence not only precluded a finding that petitioner was a continuing threat to ' society, but also precluded a finding "that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind and/or aggravated battery." App. 228. And that question was answered neither by the instruction itself, nor by the judge's reference to the instruction again, nor, we now see, by the text of the jury forms with which the jury was finally faced.

## IV

The Court repeatedly emphasizes the facts that the jury was told to consider the mitigating evidence and that the verdict forms expressly recite that the jury had given consideration to such evidence. As its refusal to find the first aggravator indicates, the jury surely did consider that evidence and presumably credited the testimony of petitioner and the other defense witnesses. But, as I have explained, see *supra*, at 240–241, there is a vast difference between considering that evidence as relevant to the question whether either aggravator had been established, and assuming that the jurors were sufficiently sophisticated to understand that it would be lawful for them to rely on that evidence as a basis for a life sentence even if they found the defendant "guilty of at least 1 of the alternatives." For that reason, the Court's reliance, *ante*, at 234–235, on the fact that the jurors affirmed their verdict when polled in open court is misplaced.

The most significant aspect of the polling of the jury is a notation by the court reporter that is unique. (At least I do not recall seeing a comparable notation in any of the transcripts of capital sentencing proceedings that I have reviewed during the past 24-plus years.) The transcript states that, as they were polled, "a majority of the jury members [were] in tears." App. 225. Given the unusually persuasive character of the mitigating evidence including petitioner's own testimony,[9] it is at least "reasonable" to infer

---

[9] The evidence showed, among other things, that before this incident Weeks had been a well-behaved student and a star high school athlete, *id.*, at 130–133, who lived in a poor community, *id.*, at 131–132, and who was raised by a well-meaning grandmother because of his mother's drug addiction, *id.*, at 143, 167; that Weeks fell in with a bad crowd, *id.*, at 150, 153, missing his chance for college when his girlfriend became pregnant and when he decided to stay and help her raise the child, *id.*, at 109; and, as the jury learned in Weeks' own words, that he was extremely remorseful, *id.*, at 127–128.

that the conscientious jury members performed what they regarded as their duty under the law, notwithstanding a strong desire to spare the life of Lonnie Weeks. Tragically, there is a "reasonable likelihood" that they acted on the basis of a misunderstanding of that duty.

I respectfully dissent.