IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP 74,445






JOHNNY PAUL PENRY, Appellant



v.



 THE STATE OF TEXAS




ON DIRECT APPEAL


FROM POLK COUNTY






 Cochran, J., filed a dissenting opinion in which Keller, P.J., Keasler, and
Hervey, JJ., joined.


OPINION 


 

 I join Presiding Judge Keller's dissenting opinion because I do not think that there is
a reasonable probability that the jury in this particular trial, given this specific evidence and
these advocates' excellent closing arguments, "applied the challenged instruction in a way
that prevents the consideration of constitutionally relevant evidence." (1)

 The jurors certainly could have done so, but I cannot conclude that they would have
done so or actually did do so. And it is this distinction between "could," "would," and "did"
that is at the heart of the Supreme Court's discussion in Boyde. (2) There is a possibility that
the jury felt itself precluded from considering appellant's evidence of mental slowness as
being among the "other" circumstances that would mitigate his moral culpability. But Boyde
requires the showing of "a reasonable likelihood" that the jury felt so restrained. (3) We are
confronted with a claim that a jury instruction, though not erroneous, is sufficiently
ambiguous to be "subject to an erroneous interpretation." (4) To evaluate this instruction, we
should not engage in a technical parsing of its language; instead, we must "approach the
instructions in that same way that the jury would-with a 'commonsense understanding of the
instructions in the light of all that has taken place at the trial.'" (5) Thus, we must look beyond
the four corners of the jury instructions themselves to the content and conduct of the trial.

 This jury was selected solely to answer the special punishment issues in a death
penalty case. The jury heard more than fifty witnesses during the course of the four week
trial. The primary focus of that trial was the character and conduct of Johnny Paul Penry
throughout his life. 

 The State presented one vision and version of him: he was a bad seed who sprouted
into a poisonous apple. He was not, according to the State's witnesses, mentally retarded or
mentally defective. He was a "slow learner" because he did not want to learn. He had a
"difficult childhood" and was raised by an imperfect mother who was mentally ill. But,
according to the State, "she also had a very problem child here at a very early age, a young
capital murderer that was growing up in her midst." He was educationally and socially
deprived as a child, but he was also a "faker," a "manipulator" with "an anti-social
personality." He had unrepentedly raped before, and was sent to prison because his
victim-left alive-could identify him. When he raped again, he was shrewd enough to kill his
victim so she could not identify him and have him sent back to prison. Whatever his
educational deficiencies, he was "street smart" enough to be fully accountable and morally
culpable for his capital crime.

 The defense presented an entirely different version of him: Johnny Paul Penry was
a pitiable man with severe mental impairments and a "history of severe and serious and
sustained child abuse and torture." He was diagnosed at an early age with mental retardation
and placed in a special class for the mentally retarded. Instead of receiving love and support
for his mental deficiencies, his mother treated him "like an animal." She locked him up in
his room, repeatedly beat him, threatened him with a butcher knife, and made him eat his
own feces because he had a "broken brain." According to defense counsel, "He's not just
mean and bad, through and through. He wants to improve himself. He doesn't have much
to work with. But he wants to." These were "mitigating circumstances in this case that
reduce moral blameworthiness."

 Four weeks of trial testimony circled around the intersection of Johnny Paul Penry's
mental abilities and moral culpability and to what extent his mental "slowness" was related
to his deplorable childhood. 

 The potential ambiguity in the jury instruction is caused by a single word, "other,"
contained within the application instruction for the fourth special issue:

 Therefore, you are instructed that if you believe from all the evidence
that the Defendant is a person with mental retardation, then you are instructed
to answer Special Issue No. 4 "yes." However, if you do not believe from all
the evidence that the Defendant is a person with mental retardation, then you
shall follow the Court's instructions previously given herein concerning the
appropriate answer to Special Issue No. 4 and consider whether any other
mitigating circumstance or circumstances exist as defined herein.


The potential ambiguity then is whether there is a reasonable likelihood that, once the jurors
unanimously concluded that Penry was not "mentally retarded" as that term had been legally
defined, they (erroneously) believed that they could not consider any of the evidence
concerning his mental "slowness." That is, did these jurors think that they were prohibited
from continuing to consider the evidence of his lack of educational progress, his indisputably
low I.Q., and the wealth of evidence concerning "deficits or impairments in present adaptive
functioning" in the areas of "[c]ommunication, self-care, home living, social/interpersonal
skills, use of community resources, self-direction, functional academic skills, work, leisure,
health, and safety" that existed before the age of eighteen? If so, in answering the fourth
special issue, the jurors would have ignored the vast majority of the evidence admitted during
this lengthy trial. 

 It seems manifestly unlikely that not a single juror would have protested and said,
"Wait, surely we may consider that same evidence of some level of mental deficiency and
how Johnny Paul Penry's mental slowness affected his upbringing, character, conduct, and
moral culpability?" At least the jurors might reasonably have been expected to send out a
note to the judge requesting clarification if they had questions concerning the meaning of the
word "other" in this context. (6) 

 The absence of such a note or any other sign from the jurors that they did not
understand what was expected of them suggests that one of two things happened: they all
agreed that "other" did exclude consideration of all mental-slowness evidence or they all
agreed that it did not. But to conclude that they would have ignored the mental-slowness
evidence would have required them to ignore the content and tenor of every word in the jury
instructions except the word "other." The common-sense gist of Special Issue Number Four
is simply this: "If you believe that there is any credible reason why this man should not be
executed, you must vote for life imprisonment." To conclude that it is "reasonably likely"
that this jury did not get the message requires one to assume that they were all mentally slow.

 Instead, it is a reasonable likelihood that this jury, like the two previous juries, 
believed that the State's version and vision of Johnny Paul Penry and his moral culpability
was a more compelling one than that presented by the defense. And it was their right to
reach that conclusion based upon all of the evidence and a common-sense reading of the jury
instructions.


Cochran, J. 

Filed: October 5, 2005

Publish
1. Boyde v. California, 494 U.S. 370, 380 (1990).
2. Id. at 379-80. The Supreme Court forthrightly admitted that "[t]he legal standard for
reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant
evidence is less than clear from our cases." Id. at 378. The Court stated that in one case it had
said that "[t]he question . . . is . . . what a reasonable juror could have understood the charge as
meaning." Id. (citation omitted). But in another case it had referred to both what a reasonable
juror "could" have done and what he "would" have done. Id. at 379 (citation omitted). In still
another case, the Court phrased the matter as whether it is probable that "reasonable men might
derive a meaning from the instructions given other than the proper meaning." Id. (citation
omitted). In Boyde, the Supreme Court concluded that "[a]lthough there may not be great
differences among these various phrasings, it is important to settle upon a single formulation for
this Court and other courts to employ in deciding this kind of federal question." Id. The legal
formulation settled upon was: "whether there is a reasonable likelihood that the jury applied the
challenged instruction in a way that prevents the consideration of constitutionally relevant
evidence." Id. at 380.
3. Weeks v. Angelone, 528 U.S. 225, 236 (2000) (citing Boyde, and holding that death-penalty mitigating-evidence instructions were constitutionally adequate); see also Estelle v.
McGuire, 502 U.S. 62, 74-75 (1991) (stating that "[w]hile the instruction was not as clear as it
might have been, we find that there is not a 'reasonable likelihood' that the jury would have
concluded that this instruction, read in the context of other instructions, authorized the use of
propensity evidence pure and simple").
4. Weeks, 528 U.S. at 238 (Stevens, J., dissenting).
5. Johnson v. United States, 509 U.S. 350, 368 (1993) (quoting Boyde, 494 U.S. at 381).
6. See Armstrong v. Toler, 24 U.S. 258, 279, 11 Wheat. 258 (1826) (opinion of Marshall,
C. J.) ("Had the jury desired further information, they might, and probably would, have signified
their desire to the Court.").