*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

NICHOLAS MICHAEL KUDLA,

        Defendant-Appellant.

UNPUBLISHED
August 17, 2023

No. 358948
St. Clair Circuit Court
LC No. 19-002856-FH

Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions for assault by strangulation, MCL 750.84(1)(b), and aggravated domestic violence, second offense, MCL 750.81a(3). Following a resentencing hearing, defendant was sentenced, as a third-offense habitual offender, MCL 769.11, to 30 to 240 months' imprisonment for the assault by strangulation conviction, and 30 to 120 months' imprisonment for the aggravated domestic violence, second offense, conviction. We affirm.

This case arises out of defendant's assault of the victim, defendant's girlfriend, on November 7, 2019, at their shared residence located in Columbus, Michigan (Columbus residence). The victim was residing at the Columbus residence, with defendant and her children, for approximately 1½ years. At the time of the underlying incident, the victim and defendant were in a dating relationship for approximately two years. During her original statement to Sergeant Christopher Tuckey at the Columbus residence on November 7, 2019, the victim stated that she was peacefully watching a movie with defendant the previous evening, both parties were drinking, and the argument did not begin until 2:00 a.m. or 3:00 a.m. The victim expressed to Sergeant Tuckey that during the initial verbal altercation with defendant, defendant "went crazy," pulled the victim out of the bed by her arms, and began punching the victim in the face. Furthermore, defendant climbed on top of the victim, placed a knee on her chest, covered the victim's mouth to prevent her from screaming, choked her, and continued to hit and kick the victim while calling her a b***h.

-1-

During the initial interview with Sergeant Tuckey, the victim stated that a second altercation occurred later that morning after the parties separately went to sleep. Defendant grabbed the victim's cellphone and tried to use her face to unlock it to determine whether the victim was unfaithful. Defendant continued to argue with the victim and started to strike the victim's face with the cellphone. The victim eventually ended up in her children's bedroom and attempted to contact emergency services using the landline phone; however, defendant dragged her to the living room, threw the victim into the wall, and continued to hit the victim in the face until he saw blood. The victim additionally asserted, to Sergeant Tuckey, that defendant stopped assaulting her at some point and left the room; the victim subsequently ran outside with her cellphone, and defendant caught her and dragged the victim back towards the residence resulting in injuries to her bare feet. The victim was screaming and holding onto the railing as defendant was pulling her up the stairs to the front door of the Columbus residence. Defendant obtained the victim's cellphone and remained in the home while the victim was outside for approximately four minutes before Sergeant Tuckey arrived.

During trial, the victim presented exculpatory testimony regarding defendant's conduct that provided an entirely different narrative concerning what transpired on November 7, 2019. The victim asserted that the altercation with defendant did not cause any sort of disfigurement or impairment to her body, and she labeled herself as the aggressor. The victim asserted that her statement to Sergeant Tuckey was entirely fabricated because the victim was upset at defendant threatening to leave the residence and taking the victim's cellphone. The prosecution presented the testimony of Sergeant Tuckey, who extensively interviewed the victim on more than one occasion and handled the initial investigation of the case, photographs of the victim's injuries, the victim's medical report following a hospital visit, a video recording of Sergeant Tuckey's interview with the victim, and the audio recordings from the three calls with emergency services. On rebuttal, the prosecution presented the testimony of KM, defendant's ex-girlfriend, who testified as to defendant's prior acts of domestic violence.

Defendant argues that he was denied his constitutional right to a fair trial by repeated prosecutorial misconduct. We disagree.

" 'Because the challenged prosecutorial statements in this case were not preserved by contemporaneous objections and requests for curative instructions, appellate review is for outcome-determinative, plain error.' " *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017), quoting *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Stokes*, 333 Mich App 304, 307; 963 NW2d 643 (2020) (quotation marks and citation omitted). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*.

"A prosecutor 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that

justice shall be done.' " *People v Evans*, 335 Mich App 76, 89; 966 NW2d 402 (2020), quoting *Berger v United States*, 295 US 78, 88; 55 S Ct 629; 79 L Ed 1314 (1935). Thus, the test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016). This Court review claims of prosecutorial misconduct on a case-by-case basis, "examining the pertinent portion of the record and evaluating the prosecutor's remarks in context." *People v Akins*, 259 Mich App 545, 562; 675 NW2d 863 (2003) (quotation marks and citation omitted).

"[T]he propriety of a prosecutor's remarks will depend upon the particular facts of each case." *People v Callon*, 256 Mich App 330; 662 NW2d 501 (2003). Pertinent to this case, it is well established that a prosecutor may not "urge the jury to convict as part of its civic duty or on the basis of its prejudices." *Unger*, 278 Mich App at 237. By interjecting such prejudices to the jury, a prosecutor inappropriately asks the jury to convict the defendant not on the basis of his or her individual guilt or innocence, but because of the necessity to protect the community from persons like the defendant and from crimes such as those the defendant is accused of perpetrating. See *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007) (stating "[a] defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence"). Prosecutors are generally afforded great latitude regarding their arguments and conduct at trial. *Unger*, 278 Mich App at 293. Moreover, "[a] prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003).

Defendant first contends that certain statements by the prosecution, during its closing argument, were not supported by, or were contrary to, the evidence presented. Specifically, defendant contests the prosecution's comments regarding the cyclical nature of domestic violence, the behavior of abused victims, and the credibility of the instant victim's testimony. Defendant claims the prosecution was attempting to portray the victim as a "battered woman," and that such condition requires expert testimony. Because of the absence of expert testimony, defendant claims the statements were unsupported by the evidentiary record.

A review of the prosecution's statements, in context, does not lead us to conclude that it was an attempt to portray the victim as suffering from battered woman syndrome or otherwise demarcate the broader nature of domestic violence cycles. Testimony from a qualified expert can, when relevant, help a jury evaluate a complainant's credibility. See *People v Kowalski*, 492 Mich 106, 124; 821 NW2d 14 (2012) (stating this Court has previously allowed a prosecution expert to testify about battered woman syndrome and how a victim of domestic violence might deny, repress, or minimize the abuse). But in the instant case, the context for the prosecution's statements was its characterization of defendant as a person exerting significant "power and control" over the victim, and a subsequent attempt to describe the nature of defendant's relationships with numerous persons, not just the victim. The prosecution stated:

> [w]hen you're talking about domestic violence and domestic assault and abusive relationships related to domestic violence you're essentially talking about, I think of it and what a lot of people think of it in the legal community and the community at large[,] is [a] domestic violence cycle. In which you get [sic] with a domestic violence cycle . . . first attention builds, second phase is that there's the actual

-3-

incident. Then there's reconciliation, forgiveness, and then there's the period of calm and then it cycles back to the tension-building incident, reconciliation, period of calm. That's the cycle of domestic violence.

And you also have, you can have it in generational terms. The parents get assaulted, kids are witnesses. And it goes back to power and control. And what was the power and control in this case? It's the People's argument that the Defendant was exerting his power and control over that victim . . . . Power over what? Her phone, her property, her house, their relationship, her. That's who he is. He exerts this power and control over her.

Defendant admitted that while a no-contact order was instituted by the trial court because of the underlying incident, he renewed contact with the victim in January 2020, the two moved back in together in February 2020, and the victim and defendant maintained a dating relationship since that time. It was further revealed at trial that the victim was two months pregnant with defendant's child. Moreover, the prosecution explained that the legislature delineated a domestic violence hearsay exception in MCL 768.27c because "recanting victims [are] something that's part of the domestic violence cycle, and so that's why we have this law." The prosecution further noted the aforementioned exception allowed the prosecution to use the victim's previous statement, despite the notable distinctions between the victim's original statement to Sergeant Tuckey on November 7, 2019, and her subsequent exculpatory testimony at trial. During its closing argument, the prosecution shared that the jury was allowed to consider defendant's previous acts against KM in determining whether defendant was guilty in the instant case, and the prosecution argued, "it was all part of the DV cycle. Maybe with a different woman, but it's still the same abuser."

Based on the totality of the evidence presented, and reasonable inferences arising therefrom, the prosecution was within its authority to advance its argument that a cycle or pattern of abuse existed between defendant and the victim. Immediately following the underlying incident, the victim provided an incriminating statement to Sergeant Tuckey, and the victim met with Sergeant Tuckey a second time to go over details pertaining to the physical altercation. But then, the victim and defendant reignited their relationship in January 2020, despite the binding no-contact order, and the victim opted to present exculpatory testimony at trial in an apparent effort to protect defendant. Moreover, the victim was two months pregnant with defendant's child. The victim's decision to leave defendant following the November 2019 incident, only to have defendant reunite with her less than two months later and subsequently share a residence and become pregnant together, demonstrates the pattern of defendant's use of force and violence with reconciliation and peace in their relationship.

During its closing argument, the prosecution subsequently iterated the individual elements of the charges, and then the elements' application to the facts of the instant case. When explaining intent as it related to the strangulation allegation, the prosecution stated:

[w]hen you think of the domestic violence cycle and that the tension builds and it leads to that incident, strangulation is very important in the world of domestic violence, because it's not just the domestic violence assault. Strangulation is the next step. Because when you put your hands or throat or hands or mouth over a person's neck or throat, or attempting to restrict a person's breathing, no matter for

a second, 10 seconds or more, that is an intentional act. And psychologically that's going to the next level. Because at that point what does that ultimately result in, potentially, later on down the road if it goes beyond that.

So, I would argue to you when you're talking about choking, it's taking that to the next level, and that's where DV is incredibly dangerous. And that's why this case gets incredibly dangerous. It does not take long to strangle a person, such as they stop breathing forever. And the psychological intent of an individual who could strangle a person, that's dangerous because now they're escalating, and that's what's happening in this case. This Defendant's DV, his abuse, his power and control, it's escalating. Remember what this case is about. It's about that Defendant's behavior.

The photographs of the victim's injuries admitted during trial, the victim's original statement to Sergeant Tuckey on November 7, 2019, the 911 audio recordings, and the testimony of Sergeant Tuckey support the prosecution's assertions regarding the escalation of the circumstances surrounding the victim's assault. See *Dobek*, 274 Mich App at 66 (noting "[t]he prosecution has wide latitude in arguing the facts and reasonable inferences, and need not confine argument to the blandest possible terms"). While the initial argument between defendant and the victim revolved around property in the Columbus residence and the contents of the victim's cellphone, it escalated when defendant pulled the victim out of the bed by her arms, punched the victim in the face, choked the victim, and continued to hit and kick the victim while calling her a b***h. After the two went to sleep following the first altercation, defendant and the victim proceeded to fight later that morning, which featured defendant striking the victim's face with a cellphone, dragging the victim into the living room and throwing her against the wall, hitting the victim in the face until he saw blood, and dragging the victim up the porch stairs to the front door of the Columbus residence. The increasing physical violence throughout the two altercations was supported by the admitted photographs portraying marks to the victim's face, mouth, nose, eyes, arms, and feet. Furthermore, the details of the domestic assault at issue were more severe than the previous incidents in 2011 and 2012 involving KM and defendant, which featured defendant grabbing KM's face during an argument and aggressively pushing her mother.

Defendant next advances that the prosecution improperly interjected the broader, sensitive national and local matter of domestic violence and the treatment of domestic violence victims in an effort to appeal to the jury, and the prosecution's statements resembled the type of "civic duty" argument this Court has expressly prohibited. Defendant challenges the following statement by the prosecution during its closing argument:

. . . And that's why we're here, because on November 7th as part of this DV cycle of the tension building into the incident[,] you have this series of incidents starting in the early morning hours of November 7th into the later morning hours. Incredibly violent, incredibly dangerous. And the pictures and the photos and the audio recordings, and even the testimony, all of that shows just how dangerous these things can be and why domestic violence is so serious, and why you should take it so serious[ly].

Given the entirety of the prosecution's argument, this statement appears to be an inference the prosecution drew from the evidence presented at trial, yet a comment of the type the court had already instructed the jury to give no weight to in terms of sympathy or prejudice during its deliberations. Prior to opening statements, the court instructed the jury that the evidence was comprised only of the witnesses' sworn testimony and the exhibits admitted into evidence, and that the statements and arguments of the attorneys were not evidence. See *Weeks v Angelone*, 528 US 225, 234; 120 S Ct 727; 145 L Ed 2d 727 (2000) (stating a jury is presumed to follow its instructions). The trial court repeated similar instructions to the jury following the parties' closing arguments, and this Court has determined a trial court's instructions that "[t]he attorneys' statements and arguments are not evidence" and that "[y]ou should only accept things the attorneys say that are supported by the evidence or by your own common sense and general knowledge[,]" were sufficient to cure a prosecutorial error as jurors are presumed to follow their instructions. *Unger*, 278 Mich App at 237 (quotation marks omitted).

Defendant contends that such a presumption should not apply in the instant case because defendant's trial was relatively brief and almost all of the prosecution's closing was improper. See *id.* at 237 (concluding that the trial court's instructions were curative because the prosecution's improper statements were "relatively brief and likely did not deflect the jury's attention"). Even assuming, *arguendo*, that the prosecution's statements during its closing argument were improper, in light of the evidence admitted, the court's instructions, and the presumption regarding the efficacy of the instructions to the jury, we are not persuaded that the challenged statements were outcome determinative, or otherwise impacted defendant's substantial rights under a plain-error analysis.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Kathleen A. Feeney