Filed 11/26/13  P. v. Robinson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055003 |
| v. | (Super.Ct.No. FVA801386) |
| KELLY ROBINSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

David M. Dudley for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis, and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION[1]

Defendant Kelly Robison was 18 years old when he was arrested for a gang-related shooting. A jury convicted defendant of one count of attempted murder with a gang enhancement (§§ 664/187, subd. (a), and 186.22, subd. (b)(1)(C)) and acquitted him of two other counts and witness intimidation. The jury did not find true various firearm allegations. The court sentenced defendant to a prison term of seven years to life plus 10 years for the gang enhancement.

On appeal, defendant argues the gang expert was not properly qualified and, in the alternative, the gang issue should have been bifurcated and tried separately. Additionally, defendant maintains the trial court erred by instructing the jury about flight showing consciousness of guilt and committed several other forms of instructional error. After careful but deferential review, we affirm the judgment.

II

STATEMENT OF FACTS

The shooting occurred in the early morning hours of July 31, 2008, in the driveway of the residence of David Martin and Sharon Martin at 14221 Remington Court in Fontana. Remington Court is a short street, terminating in two cul-de-sacs, and intersecting with East Lincoln Loop Road. Evidence reflected the shooting occurred because of rivalry between the HG and NAW gangs.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

## A. *Testimony of McGraw*

Joseph McGraw was visiting his sister, Sharon Martin.[2] After midnight on July 31, 2008, McGraw and his sister's husband, David Martin, were in the garage smoking cigarettes. When Sharon saw a man with a gun, she called the police and the Martins and McGraw moved out of the garage to the driveway. McGraw was shot as he was standing by David and tried to take cover under a vehicle. McGraw could not identify the shooter.

Dr. Paul Burton, an orthopedic surgeon, testified that McGraw sustained an abdominal injury to the pancreas, a gunshot wound to the flank, and an open fracture to the elbow. McGraw's injuries required two surgeries and the insertion of permanent plates in his elbow.

## B. *Testimony of Sharon Martin*

Sharon testified that, in July 2008, she lived with her husband and children but her 18-year-old son, Tyson, had moved out in June after his high school graduation. When she went to bed on July 30, McGraw was not inside the house. At 1:00 a.m. on July 31, Sharon woke up because McGraw was loud and intoxicated. When she looked out the window, she saw four men walking toward Liberty Loop Road, away from the Remington Court cul-de-sac. Sharon told David that one of the men, codefendant Gregory Atkins, was carrying a gun. She called the police because she thought it might be related to a custody dispute involving David's daughter. Sharon followed David

---

[2] The Martins also use the surname Salter. Sharon had a 2007 perjury conviction for using a false driver's license.

toward the cul-de-sac where he was talking to the men down the street. He yelled at them to "get out of here." Sharon was able to see codefendant Atkins.

About 10 minutes passed. While waiting for the police, the Martins and McGraw continued talking and smoking in the garage, before moving to the driveway. At that point, the neighbor's motion light activated. David pushed Sharon on the ground as gunshots were fired. Sharon glimpsed a man wearing the same dark-colored shirt as codefendant Atkins. She testified that Atkins was the shooter. McGraw yelled that he had been shot and Sharon ran upstairs to check on her children.

Afterwards, Sharon did not want to talk to the police because she was concerned about the danger to her family. Although she did not tell the police about recognizing codefendant Atkins, she did tell them she saw one suspect fleeing in a gray SUV. She identified codefendant Atkins from a photographic lineup. She decided to cooperate with the police after her husband planned to surrender to custody and she had been frightened by a street encounter with codefendant Atkins.

Sharon did not recall that Atkins had been friends with her son, Tyson. She denied that Tyson was involved in gangs. Since the shooting incident, her family experienced problems and had to relocate to a new home and schools. She acknowledged that David Martin had been a Du-Roc Crips gang member.

*C. Testimony of David Martin*

David Martin testified that, when Sharon told him she had seen some men, one of whom was armed, he walked up the street to check it out. Sharon tried to stop him because she preferred to call the police to handle it. David saw four men, wearing dark

4

colors and hoodies, walking toward the cul-de-sac. The men turned and faced him from a distance of about five feet and he recognized them from previous contacts as defendant, codefendant Atkins, Ranson Barrett Sparrow, and Jakeen Morgan. Defendant and Atkins were in front and the other two were behind them.

David said Tyson "socializes" with the NAW gang. Defendant, Atkins, and Sparrow had been friends with Tyson in high school in 2007. David had seen defendant at the Martin house and in the park playing basketball where David had smoked marijuana with defendant. Morgan was also in school with Tyson. A couple of days before this incident there had been a shooting nearby involving David's daughter.

David asked the four men what they were doing and defendant asked for Tyson. David told him Tyson was not living there. When David said Sharon had called the police and the men should leave, they started to walk away. Defendant raised his shirt and displayed the butt of an automatic gun in his waistband.

After following the men, David returned to his house where Sharon and McGraw, who was drunk, were arguing in the driveway and waiting for the police. When the neighbor's motion detector lights activated, David saw the four men emerge from behind another house. Defendant and Atkins began firing guns. David shoved Sharon down and squatted behind a vehicle. The gunshots hit their vehicles and the house. McGraw was wounded. Defendants ran off and fled in an SUV.

When David was first interviewed by the police, he did not cooperate because he

5

was about to serve a one-year jail sentence for a 2008 robbery conviction[3] and he thought he would not be able to protect his family if he testified. He decided to testify after a threatening encounter with Atkins and Sparrow. In August 2008, he identified defendant, Atkins, Sparrow, and Morgan in photographic lineups. David testified that defendant and Atkins had the guns and were the shooters.

David admitted he was formerly a gang leader with the Du-Rock Crips gang with a 25-year association. He had been involved in violence and a victim of three shootings. He testified it was against the rules of the gang to cooperate with the police. Instead, the gang would engage in retaliation. A person in custody was in danger if he was labeled a snitch or a rat. In October 2008, the four men who had been involved in the shooting threatened David while they were all incarcerated. They yelled at him and called him a snitch. Atkins asserted he was from "Palmer Blocc" and "HG." Defendant called David an "OG," meaning an older gangster. David was more concerned about his family's safety than his own. Other people had threatened him about testifying and his family had to relocate.

In cross-examination, David admitted having testified at the preliminary hearing that he first heard about the men walking by from Sharon when he was upstairs playing a game. He was not sure whether she said one of the men had a gun. There were numerous inconsistencies between David's testimony at trial, at the preliminary hearing, and in various other statements he made to the police, particularly about who was armed

---

[3] David also admitted he had a 1997 felony conviction for burglary.

6

during the shooting.

*D. Other Prosecution Evidence*

The first officer on the scene, Casey Mutter, heard gunshots as he approached the location and was flagged down by David Martin. McGraw was on the ground bleeding. Martin said the assailants had run away in a northeastern direction between two houses. Martin was upset and uncooperative. He said he could not identify the assailants because he had dived for cover. Sharon Martin told Mutter she was inside the house when she heard several gunshots and she saw four men run to a gray SUV and speed away. She was not forthcoming about other details. Mutter did not observe an SUV leaving the scene.

Police Sergeant Thomas Yarrington also responded to the report involving four Black males and a gun. As Yarrington approached Remington Court, he heard five gunshots in rapid succession. In less than one minute, he drove to the scene where it was chaotic with lots of yelling. McGraw was coherent but moaning. Both of the Martins were argumentative and uncooperative, consistent with the behavior of other witnesses in gang-related crimes. David said the shooters left in a silver or gray SUV. Sharon told the police she had observed four or five Black males and one was carrying a gun so she called 911. After she heard gunshots, they fled in a silver SUV or on foot.

On August 5, 2008, the Martins contacted a police detective, Cliff Ohler, to offer more information. David Martin continued to be uncooperative but he identified the four assailants as defendant, Atkins, Sparrow, and Morgan in photographic lineups. David did not mention defendant, who used the gang moniker of "Punches," having possession of a

7

gun.  David was fearful of retaliation.

On August 6, 2008, the detective learned defendant was staying with a gang member, Jason Wooten, who was affiliated with "HG" —Hustler Gang or Heritage Gang—and known as "Problem Child."  Police arrested defendant after chasing him through a residential neighborhood and overcoming his resistance to being handcuffed.

In a recorded police interview, defendant initially said he had heard about a shooting but he denied being involved.  He claimed he was at home on the night of the shooting.  Defendant knew Sparrow and Morgan but he denied having any gang affiliations except with Pasadena Denver Lane Bloods.  Defendant explained that "HG" refers to "Harry Glenn," a "dead homie."  Defendant had "Punches" tattooed on his forearm.  Later in the interview, defendant admitted being "HG" or "Hustler Gang."  He said the shooting occurred because of retaliation and escalation among gang members. The people present were "Smooth" (Marquis Walker), Problem Child (Jason Wooten), and Jakeen Morgan, but not Sparrow.  Only one person, Smooth or "Keese"[4] had a gun. Defendant claimed the NAW gang shot first and Smooth shot back in response. Defendant ducked when he heard the shooting and then began running.

While searching Atkin's residence, police found a .45-caliber semiautomatic handgun, a box of .25-caliber ammunition, and a sock containing 13 or 14 rounds of .38-caliber ammunition.  Atkins's stepdad claimed the gun belonged to him.  There was gang graffiti, including the initials "HG" in one of the bedrooms, which was not occupied by

---

[4]  Keese could not be identified until later.

Atkins.

*E. Gang Testimony*

A gang expert, Kellen Guthrie, testified about gang culture and practice. He was familiar with the HG gang, also known as Koehler Park Hustler. In July and October 2008, HG was an active gang with several members. HG is a rival gang with NAW. The primary activities of HG were attempted murder, assault with a deadly weapon, and robbery. Atkins and defendant were active HG members.

In May 2006, Craig Payne of HG was shot close to the Martin house by shooters yelling NAW. Marquis Walker, also known as Keece, was an HG member. Wooten, or Problem Child, was an HG member. Both Walker and Wooten had been victims of shootings.

In July 2008, HG was involved in a dispute over territory with NAW. The shooting at the Martin residence was directed at their absent son, Tyson, and the NAW gang. David Martin was a former Du-Roc gang member. Additional gang-related testimony will be discussed below.

III

GUTHRIE'S QUALIFICATIONS AS A GANG EXPERT

Defendant contends Guthrie was not qualified to testify as a gang expert, including his opinions about defendant and the HG gang.

A witness is qualified to testify as an expert if the witness has specific knowledge, skill, experience, or education pertaining to the matter on which the testimony is offered. (Evid. Code, § 720.) "The trial court's determination of whether a witness qualifies as an

9

expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse. [Citation.] "'Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.'" [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322.) Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

At an Evidence Code section 402 hearing, Guthrie testified he had been a police officer for over four years and had been assigned to the gang unit in the Fontana Police Department for the previous year and a half. He had attended the police academy for six months, including a class on gangs. While a patrol officer, he attended one or two trainings by the gang unit which lasted about 30-60 minutes each. After his assignment to the gang unit, he attended nine days of gang training. In November 2008, he attended the Riverside County Gang Investigator's Conference, a 40-hour class. In the summer of 2009, he attended the San Bernardino County Advanced Gang Awareness training, which was a 24-hour class. He also attended an eight-hour class on the Mexican Mafia. During his four years in law enforcement, Guthrie had interviewed hundreds of gang members and had arrested well over 100 people for gang-related offenses. He had also read professional literature about gangs. Guthrie had previously testified as a gang expert at six preliminary hearings, including this case. Guthrie first learned of the HG gang in August or September of 2008, right after he joined the gang unit. He had contacted at

least three HG members and investigated several shootings which involved other HG gang members as victims.

Over defendant's objection, the trial court allowed the officer to testify as a gang expert. We conclude the trial court did not abuse its discretion because Guthrie demonstrated the special knowledge, training and education required to qualify him as an expert on gangs. Most notably, Guthrie qualified as a gang expert based on his four years of experience as a police officer and a gang investigator, his specialized gang training, his contacts with hundreds of gang members, and his investigation and review of gang-related crimes, including those involving the HG gang. Even if another gang expert had more experience than Guthrie, Guthrie certainly had greater knowledge of gangs and the HG gang sufficiently beyond common experience of the average person. (Evid. Code, § 801, subd. (a).)

As the trial court explained when it denied defendant's new trial motion: "With regard to the gang expert, the Court will allow that there are probably more experienced gang experts. But I don't think that is the standard for which the Court can allow the officer to testify. [¶] . . . And it is my recollection that this person who is a gang expert has qualified as such before in court . . . he has testified several times and qualified as an expert. [¶] How the jury is to take the level of his expertise is up to them. They could have found him not credible at all, especially in light of what I recall being a vigorous cross-examination of this witness. [¶] So [any misrepresentations] would have been brought out on cross-examination if he made any misrepresentations as to the gang alleged to be the subject matter of this trial."

11

Although defendant is highly critical of the depth of Guthrie's experience, even if Guthrie's experience was less extensive than some other gang officers, he nonetheless had sufficient gang training and experience for the trial court reasonably to conclude that he was qualified to testify as an expert. The jury could then evaluate his knowledge of gangs, including the HG gang, from his testimony on direct and cross-examination. (CALCRIM No. 332; *People v. Bolin, supra,* 18 Ca1.4th at p. 322.) The trial court did not err in allowing Guthrie to testify that defendant was a member of HG, a criminal street gang, and that the shooting occurred because of a dispute with the NAW gang, with whom Tyson was affiliated.

IV

BIFURCATION OF THE GANG ENHANCEMENT

Defendant next contends the trial court abused its discretion when it denied his motion to bifurcate the trial on the gang enhancements from the trial on the substantive charges. We conclude there was no abuse of discretion because the evidence on the gang enhancement was cross-admissible with the evidence on the underlying charges. Furthermore, any error was harmless.

Before trial, defendant joined codefendant Atkins's motion to bifurcate the trial because the gang evidence would be unduly prejudicial and was not relevant to the underlying charges. The prosecutor argued the gang evidence was relevant to prove both the gang enhancements and the motive for the shooting, which was done in retaliation for a previous gang-related shooting. The prosecutor also argued the gang evidence was relevant to explain the witnesses's inconsistent statements, reluctance to testify and bias.

12

The court found that the probative value of the gang evidence on the substantive charges outweighed its prejudicial effect and denied the motion. The court also found it would be "derelict in its duty" if it bifurcated the gang evidence from the evidence on the witness intimidation charge. Finally, the court found the gang evidence would tie directly to the attempted murder charge if the jury believed the witnesses and further noted that it was the jury's task to judge the credibility of witnesses. The trial court allowed the prosecutor to present the testimony of the gang expert over defense objection. The court denied defendant's new trial motion on the same grounds.

A trial court's denial of a bifurcation motion is reviewed for abuse of discretion. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048.) Because a gang enhancement is inextricably intertwined with the attached substantive offense, less need for bifurcation generally exists with a gang enhancement than with a prior conviction allegation. (*Ibid.*) Even if some of the evidence offered to prove the enhancement would be inadmissible at a trial of the substantive crime when no gang enhancement is charged, a court may still deny bifurcation because of countervailing considerations such as avoiding an increased expenditure of funds and judicial resources favoring joint trials. (*Id.* at p. 1050.) Here, the trial court properly denied defendant's motion to bifurcate the gang enhancement allegations. The gang evidence was relevant to prove the motive for the shooting that defendant's gang had an ongoing dispute about territory and the shooting in the instant case was retaliatory. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550; *People v. Martin* (1994) 23 Cal.App.4th 76, 81-82 [gang activity or membership admissible as to motive, though damaging to defense].)

13

As the prosecutor argued, the People would be prejudiced by bifurcating the gang allegation because the "People would have to present an attempt[ed] murder which would appear to be random and unprovoked. There would be no motive for the jury." The jury was properly instructed on motive, based on CALCRIM No. 370: "The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

In addition, the gang evidence was relevant to the witness intimidation charge— for which defendant was not convicted—because defendant told David Martin he should have kept it "on the street" when confronting him on his way to court, a reference to the gang code of conduct. Finally, the gang evidence was relevant to show why the Martins were uncooperative with police and reluctant to identify their assailants in fear of retaliation. On the other hand, the gang evidence was not unusually likely to inflame the jury against defendant any more than the evidence in a typical gang case. Under these circumstances, the trial court did not abuse its discretion by denying defendant's motion to bifurcate the gang enhancement.

In any event, any error was harmless as it is not reasonably probable a result more favorable to defendant would have been reached absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 837.) First, there was no unexpected, inflammatory gang evidence presented at trial. Second, because the jury found defendant not guilty of other counts and found the gun enhancement allegations not true, it shows the jury considered the

14

evidence and did not simply convict defendant of the charged crimes and enhancements because he was a gang member. Although David Martin did not initially cooperate with police and denied being able to identify his assailants on the night of the shooting, he explained that he was concerned about the safety of his family and himself. He also explained that he was in a street gang and it was against the gang's rules to cooperate with police. David's inconsistency identifying who were the individuals with the guns probably caused the jury to find the personal gun use allegations not true. Nevertheless, David Martin repeatedly identified defendant as one of the assailants. We recognize that David was a problematic witness but—again—the jury could evaluate his credibility, as it apparently did.

Furthermore, defendant attempted to elude arrest during a police chase for 45 minutes. Finally, defendant admitted to Detective Ohler that he was near Remington Court before the shooting. Under these circumstances, any error in not bifurcating the trial on the gang enhancements was harmless.

V

CALCRIM NO. 372

Defendant next contends that the trial court erred by instructing the jury, based on CALCRIM No. 372, about flight as consciousness of guilt because there was no evidence he knew he was accused of a crime at the time he fled from officers. *Turner* held a flight instruction is proper when defendant flees a crime scene or his usual environs or escapes custody after arrest. Here the evidence showed defendant was fleeing from his "usual environs." (*People v. Turner* (1990) 50 Cal.3d 668, 718; *People v. Carrera* (1989) 49

15

Cal.3d 291, 313-314.)  We conclude the jury instruction on flight was proper and any error was harmless.

Defense counsel objected to CALCRIM No. 372 on the ground there was no evidence defendant knew he had been accused of a crime at the time he fled from the officer.  The court overruled the objection, finding there was "ample evidence" of flight.  The court subsequently instructed the jury based on CALCRIM No. 372 as follows:  "If the defendant fled or tried to flee or after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."  A flight instruction is appropriate when there is evidence that the defendant fled from the police.  (*People v. Moringlane* (1982) 127 Cal.App.3d 811, 821-822.)

Detective Ohler testified that, on August 8, 2008, he went to Jason Wooten's house to arrest defendant.  After the detective asked Wooten, a fellow HG gang member, to get defendant, defendant fled from the residence, jumping walls and fences and running through a series of backyards for 45 minutes while ignoring an officer's repeated commands to stop.  Based on defendant's behavior, the jury could reasonably infer defendant fled because he knew he was being accused of involvement in the shooting the previous week.  Defendant was fleeing his "usual environs," his fellow gang member's residence.  (*People v. Turner, supra,* 50 Cal.3d at p. 718.)

Even assuming it was error to give the flight instruction, there was no reasonable probability the instruction affected the jury's verdict.  (*People v. Turner, supra,* 50 Cal.3d

16

668, 695.) CALCRIM No. 372 leaves the factual determination about the meaning of flight to the jury. (*People v. Visciotti* (1992) 2 Cal.4th 1, 60-61.) The jury was informed some of the instructions might not apply, the jurors should not assume the court was suggesting anything about the facts because a particular instruction was given, and the jurors should apply the instructions to the facts "as you find them." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1153.) Additionally, the flight instruction emphasized that the evidence of flight from the police was not alone sufficient to establish guilt: "The cautionary nature of the [flight] instruction[] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.) In light of the cautionary nature of the instruction and the strong evidence of defendant's guilt, any error was harmless.

VI

PINPOINT INSTRUCTION ON AIDING AND ABETTING

A pinpoint instruction relates particular facts to a legal issue in the case, pinpointing the crux of the defendant's case. A trial court may properly refuse instructions that duplicate other instructions. (*People v. Wright* (1988) 45 Cal.3d 1126, 1134; *People v. Sanders* (1995) 11 Cal.4th 475, 560; *People v. Wooten* (1996) 44 Cal.App.4th 1834, 1848.)

During the discussion on jury instructions, defense counsel asked the trial court to instruct the jury with a modified version of CALCRIM No. 415, the conspiracy instruction, as follows: "You have heard evidence that Defendant Kelly Robinson may

17

have accompanied or associated with the perpetrator of the shooting on July 31st, 2008. While you may consider that accompaniment or association in determining whether Defendant Robinson aided and abetted with the commission of that crime, such accompaniment or association does not by itself demonstrate Defendant Robinson aided and abetted in that crime." The court denied the defense request because there was no evidence of a conspiracy and "it is not this Court's occupation to rewrite" CALCRIM No. 415 "to dovetail to this case."

Defendant contends the trial court should have expressly informed the jury that associating with a perpetrator does not establish aiding and abetting. Defendant claims the requested instruction should have been given because the jury heard his videotaped police statement in which he admitted that he was present with other HG members near Remington Court on the night of the shooting but denied he witnessed or participated in the shooting.

We conclude the trial court properly denied defendant's request to give a modified version of the conspiracy instruction since there was no allegation or evidence that defendant was involved in a conspiracy and the standard jury instructions adequately stated the relevant law on aiding and abetting in CALCRIM Nos. 400 and 401. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163, 1165-1166.) The jury was instructed that in order to find a defendant guilty of a crime based on aiding and abetting, the People must prove that, "The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." The jury was also instructed that, "Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he

18

specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." In addition, the court instructed the jury that "the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him an aider and abettor." These instructions, as a whole, made clear that merely accompanying or associating with the perpetrator of a crime was insufficient to constitute aiding and abetting, and supplied adequate direction to the jury concerning defendant's liability as an aider and abettor of a crime. Therefore, the trial court properly rejected the proposed pinpoint instruction. (*People v. Wright, supra*, 45 Cal.3d at p. 1134.) The trial court's refusal to give defendant's proposed pinpoint instruction did not prejudice defendant, in light of the other instructions that were given and the strong evidence that he was not merely accompanying or associating with other HG members before the shooting. (See *People v. Hernandez, supra*, 33 Cal.4th at p. 1054.)

VII

CALCRIM Nos. 400 AND 401

Defendant next contends CALCRIM No. 400 precluded the jury from finding him guilty of a lesser offense than the actual shooter because it states a person is "equally guilty" of a crime whether he committed it personally or aided and abetted the perpetrator in committing it. (*People v. Nero* (2010) 181 Cal.App.4th 504, 518.) Alternatively, defendant urges that it was ineffective assistance to fail to object to the instruction. Having failed to request modification or clarification of the instruction in the court below, defendant forfeited his claim. (*People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1163-1165; *People v. Lopez* (2011) 198 Cal.App.4th 1106,1118-1119.) But, based on the

19

instructions as a whole and the circumstances of the case, there is no reasonable likelihood that the instruction misled the jury. Finally, defendant fails to demonstrate prejudice from counsel's allegedly deficient performance.

In evaluating a claim of instructional error, a reviewing court examines the challenged instructions to determine "whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.) In addressing this question, the reviewing court "consider[s] the specific language under challenge and, if necessary, the charge in its entirety." (*Ibid.; California v. Brown* (1987) 479 U.S. 538, 541-542; *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061.) The reviewing court "determine[s] whether the instruction, so understood, states the applicable law correctly." (*People v. Warren* (1988) 45 Cal.3d 471, 487.) An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Harrison* (2005) 35 Cal.4th 208, 251-252.) Based on the instructions as a whole, and the circumstances of the case, there is no reasonable likelihood that the instruction misled the jury.

The trial court instructed the jury with CALCRIM No. 400 that a person may be guilty of a crime if he directly committed the crime or if he aided and abetted someone else who committed the crime, and that a "person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." The court also instructed the jury with CALCRIM No. 401, explaining the requirements

20

of aider and abettor liability to the jury.[5]  Under the plain language of CALCRIM No. 401, an individual cannot be guilty of aiding and abetting attempted murder unless the direct perpetrator committed the crime, the aider and abettor knew of the direct perpetrator's intent, the aider and abettor shared the same intent as the direct perpetrator, and the aider and abettor did in fact aid and abet the perpetrator's commission of the crime.  All of these elements must be met for the aider and abettor to be equally guilty of the direct perpetrator's crime.

Defendant relies upon *People v. Nero, supra,* 181 Cal.App.4th 504, in which Nero and his sister were found guilty of second degree murder.  The prosecution's theory was that the sister, acting as an aider and abettor, had handed Nero the knife used to stab the victim.  Aider and abettor instructions contained the same "equally guilty" language to which defendant objects here.  After the jury asked if the sister could be guilty of a different offense than Nero, the trial court informed the jury that principals in a crime are

---

[5]  "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  [¶]  1.  The perpetrator committed the crime; [¶]  2. The defendant knew that the perpetrator intended to commit the crime; [¶]  3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.  [¶]  If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.  [¶]  [If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor.  [¶]  However, the fact that a person is present at the scene of a crime or fails to prevent the crime, does not, by itself, make him an aider and abettor.]"

21

equally guilty and the jury found both Brown and Nero equally guilty of second degree murder. (*Id.* at p. 507.) Relying on *People v. McCoy* (2001) 25 Cal.4th 1111, the appellate court concluded that the jury was misled by the "equally guilty" language, particularly since the jury had asked the trial court several times whether it could convict codefendant Brown as an aider and abettor of a lesser crime than that committed by Nero. (*Nero,* at p. 507.)

The *Nero* court focused primarily on the "equally guilty" language of CALJIC No. 3.00 without considering the language of CALJIC No. 3.01, which sets out the elements of aider and abettor liability, now set forth in CALCRIM No. 401. Based on the requirements set forth in CALCRIM No. 401, an aider and abettor must share the specific intent of the direct perpetrator. If a defendant is not the perpetrator, but is somehow involved in the crime while having a less culpable mental state than the actual perpetrator, he cannot be liable as an aider and abettor. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) In a case where the charged crime is a specific intent crime, any aider and abettor has to share the perpetrator's specific intent. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, citing *Beeman,* at pp. 560-561].) CALCRIM No. 400, when read in conjunction with CALCRIM No. 401, correctly set forth the law on aider and abettor liability. (*People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1163, 1165-1166.)

Finally, *Nero* is distinguishable. The attempted murder in this case was willful, premeditated, and deliberate. The jury was not instructed on a lesser included crime, such as attempted voluntary manslaughter. The trial court correctly instructed the jury that, if it found defendant aided and abetted the attempted murder, he would be equally

22

guilty. (See *People v. Lee* (2003) 31 Cal.4th 613, 624-625.) Unlike *Nero*, the jury did not ask whether it could convict defendant of a lesser crime. Instead, the jury's questions showed it properly focused on the requirements set forth in CALCRIM No. 401. The jury first sent a note to the court asking: "Can you please help to clarify all the components of aiding and abetting? [¶] Do the defendants need to meet all 4 criteria of aiding and abetting to be considered guilty?" The jury sent the court a second note which asked: "Does either of the Defendants presented in this trial have to be the perpetrator?"

In light of the instructions as a whole, there is no reasonable probability the jury was misled by the "equally guilty" language in CALCRIM No. 400. (See *People v. Lopez, supra*, 198 Cal.App.4th at pp. 1119-1120 [any error harmless, as jury was instructed with CALCRIM No. 401]; *People v. Samaniego, supra*, 172 Cal.App.4th at p. 1166.)

Defendant alternately argues that, if his claim is deemed forfeited, he was deprived of his constitutional rights to the effective assistance of counsel by his attorney's failure to object to the offending language in CALCRIM No. 400. (U.S. Const., 6th Amend.; Cal. Const., Art. I, § 15; *People v. Lucas* (1995) 12 Cal.4th 415, 436.) To meet his burden, defendant must show: (1) that counsel's conduct fell below the appropriate standard of professional competence; and, (2) resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) Prejudice occurs if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Jennings* (1991) 53 Cal.3d 334, 357.) A "reasonable probability" is a probability sufficient to undermine confidence in the

23

outcome of the trial. (*Ibid.*) The California Supreme Court has recognized, "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*In re Jackson* (1992) 3 Cal.4th 578, 604, disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 545, fn. 6.) For all of the reasons previously discussed, there is no reasonable probability that a determination more favorable to defendant would have resulted if defense counsel had asked the trial court to delete the "equally guilty" language from CALCRIM No. 400. Accordingly, defendant cannot establish prejudice and his ineffective assistance of counsel claim must be rejected.

VIII

THE JURY'S INQUIRY ABOUT AIDING AND ABETTING

Lastly, we conclude the trial court properly responded to the jury's question about aiding and abetting by referring them to CALCRIM Nos. 400 and 401, and any error in not providing a more direct response was harmless.

Section 1138 provides, in part "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." The trial court has a primary duty to help the jury understand the legal principles it is asked to apply. The court does not need to elaborate on the standard instructions. Where the original instructions are themselves full and

24

complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. Indeed, comments diverging from the standard are often risky. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

When the jury asked about the four criteria for aiding and abetting, the trial court responded by referring the jury to CALCRIM Nos. 400 and 401. CALCRIM No. 401 is a correct statement of the law on aiding and abetting but defendant asserts the trial court was required to instruct the jury the prosecution had to prove all four elements of aiding and abetting beyond a reasonable doubt. Instead, the court properly advised the jury to reread the standard instructions on aiding and abetting, providing the answer to the jury's question. (*Weeks v. Angelone* (2000) 528 U.S. 225, 236.) Because the court responded to the jury's question by directing its attention to the proper instruction and the jury did not submit another question indicating it was still confused about this particular issue, the record supports the conclusion that the trial court adequately responded to the jury's question.

Even assuming that the court should have specifically informed the jury that the prosecution was required to prove all four elements of aiding and abetting, the error was harmless. Any error in this case was not structural and did not deprive defendant of his federal constitutional rights. (*Chapman v. California* (1967) 386 U.S. 18, 24.) At most, the trial court's failure to provide a more specific answer to the jury's question was a violation of section 1138. The applicable standard for determining prejudice from state law error is set forth in *People v. Watson, supra*, 46 Cal.2d at page 836. (See *People v.*

25

*Solis* (2001) 90 Cal.App.4th 1002, 1015.) Under the *Watson* standard, an error warrants reversal only if it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred. (*Watson,* at p. 836; *People v. Breverman* (1998) 19 Cal.4th 142, 178.)

Here, no reasonable probability exists that defendant would have received a more favorable outcome had the court instructed the jury that the prosecution was required to prove all four elements of aiding and abetting beyond a reasonable doubt, because CALCRIM No. 401 told the jury that the People must prove all four elements, that a defendant in a criminal case is presumed innocent, and the People must prove defendant guilty beyond a reasonable doubt. The jury was not told that either of the defendants could be found guilty as an aider and abettor without all four elements being proved beyond a reasonable doubt. Finally, strong evidence supported that defendant aided and abetted the shootings. Under these circumstances, any error in not instructing the jury as defendant requested was harmless.

IX

DISPOSITION

We reject all defendant's contentions on appeal. Absent any prejudicial error,

there is no cumulative error.  We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON_____

J.

We concur:

HOLLENHORST_____

Acting P. J.

KING_____

J.