*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
September 19, 2024

v

DANIELLE LOUISE PILLARS,

        Defendant-Appellant.

No. 365366
Kalamazoo Circuit Court
LC No. 2021-002287-FC

Before: N. P. HOOD, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right her jury trial convictions for (1) assault with intent to do great bodily harm, MCL 750.84; (2) carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b; (3) breaking and entering without permission, MCL 750.115(1); (4) larceny of a firearm, MCL 750.357b; (5) carrying a concealed weapon, MCL 750.227; and (6) two counts of resisting and obstructing a police officer, MCL 750.81d(1). The trial court ordered defendant to serve (1) 66 to 120 months for assault with intent to do great bodily harm, (2) 2 years for felony-firearm, (3) 90 days for breaking and entering, (4) 387 days for larceny of a firearm, (5) 387 days for carrying a concealed weapon, and (6) 387 days for resisting and obstructing. We affirm.

## I. FACTS

At approximately 12:47 p.m. on December 26, 2021, defendant's friend, Alexander Azizi, woke up to a loud banging noise outside his house, saw defendant exiting his detached garage, questioned defendant as to why she was there,[1] watched defendant run away, noticed that the contents of his vehicle were moved around, and realized that his wallet and firearm were missing.

---

[1] When Azizi questioned why defendant was at his house, defendant said, " 'I thought you were dead.' "

-1-

Azizi reviewed his home security footage to discover that defendant had been at his house for over one hour. Azizi described the home security footage as follows:

> She was going through everything. Like digging in the dirt. She was in the garage for a while. She was going through the trash. She was checking, like, every internet box and cable box on the house and peeking behind, you know, things hanging from the house. You know, looking under doormats and floormats and stuff. . . . [W]hat had woken me up is she was trying to kick the back door in.

Defendant also entered Azizi's vehicle, which was parked in his driveway, multiple times. Azizi explained that it was not normal for defendant to visit or enter his property without his permission. Accordingly, Azizi called the police.

At approximately 2:30 p.m. on the same day, Keyth Whitfield let his dog outside in his backyard. Whitfield stayed outside with his dog, and "a couple of minutes" later, he heard "a little voice" and his detached-garage side door squeaking open. Whitfield explained as follows:

> When it first started squeaking open, actually, my first thought was I thought I had left the garage door, like, maybe cracked a little bit, like the night before. Because the wind was blowing a little bit. So I just still stood standing there. I mean I can't say if it was a minute or whatever, but just very, very short time. The door just kept squeaking open, like, real slow. So I just stood there. Then all of a sudden, you know, it opened up . . . . You know, maybe a couple of inches. I saw a woman's face in there.

Whitfield had never seen defendant before. Whitfield explained that when he and defendant made eye contact, she closed the door, and he ran into the garage to ask her what she was doing.[2] Whitfield testified that defendant told him that she was "trying to hide out" and "needed help." Whitfield proceeded to call the police.

While Whitfield was on the phone with the dispatcher, defendant kept trying to leave. Whitfield pushed defendant away from the door and "[threw] her on her back." Whitfield proceeded to hold defendant against a speaker box.[3] At no point did Whitfield punch or kick defendant. Whitfield told defendant that he was not going to hurt her but that she was going to go to jail. Whitfield testified that he said, "Bitch, if this would have been three or four years ago, I probably would have put you in the hospital." Whitfield kept defendant restrained for approximately one minute, but he eventually let her get up because he "didn't really feel like she was a threat . . . ." However, when defendant heard that the police were on their way, she attempted to run out the side door. Whitfield proceeded to grab defendant by her coat and "slam

---

[2] Whitfield closed the side garage door behind him so that his dog would not be able to attack defendant.

[3] Whitfield explained that he called the police with one hand and held defendant against the speaker box with his other hand. At some point, Whitfield's cell phone fell on the ground, and he began restraining defendant with two hands.

her down on the floor in a hug . . . ." Whitfield did not intend to harm defendant; he just wanted to restrain her for the police.

After Whitfield restrained defendant on the floor, defendant shot Whitfield. Whitfield did not see the gun until defendant used it. Whitfield explained that it happened very quickly, and after he heard a few shots, he looked down and saw "a gun barrel coming up to the bottom of [his] neck." The first three shots that defendant fired hit Whitfield in his upper chest; however, Whitfield did not realize at first that he had been shot. Whitfield grabbed the firearm's barrel and tried to pry it away from defendant. Two or three shots went off right next to Whitfield's face, and had Whitfield not moved his head out of the way, the bullets would have struck him under his jaw. Eventually, Whitfield twisted the gun out of defendant's hand, and defendant ran to the big garage door. Whitfield attempted to fire the gun, but defendant told him that it was empty and ran under the door. Whitfield was transported to the hospital in an ambulance, and he was still in physical therapy at the time of the trial.

Police officers set up a perimeter of the surrounding area and eventually located defendant. Officers Cooper Carns and Michael Hogan of the Kalamazoo Department of Public Safety (KDPS) pursued defendant on foot, and although defendant made eye contact with the officers, she did not listen when they told her to stop running. While defendant was running away, she struck her head on a fence. After hitting her head, defendant became cooperative, and the officers placed her in handcuffs and took her to the hospital.

At approximately 6:00 p.m., Officer Mitchell Vorick of the KDPS arrived at the emergency room to stay with defendant until she was lodged in jail. Officer Vorick testified that defendant was argumentative throughout his entire interaction with her. After the hospital cleared defendant, Officer Vorick unhandcuffed defendant from the hospital bed and told her to put her shoes on so that he could take her to the county jail. Officer Vorick testified as follows:

> After [defendant] sat down on the bed and I was advising for her to put on her shoes, she stood up and just immediately began speed walking out of the room and tried to go down a hallway in the hospital. At which point I had to step out of the room, grab a hold of her, bring her back to the room, and I sat her down back on the cot and I told her that she needed to get her shoes on.

Additionally, when Officer Vorick tried to handcuff defendant, defendant yelled that Officer Vorick was assaulting her. Officer Hogan and Officer Vorick both testified that defendant appeared to be under the influence of controlled substances.

Defendant testified and ultimately claimed self-defense for the shooting of Whitfield. Defendant explained that she: (1) secured Azizi's firearm and wallet from his unlocked vehicle, and she was waiting for him to wake up so that she could give it back to him; (2) left Azizi's house with his firearm and wallet because Azizi appeared irritable and upset after he woke up; (3) entered Whitfield's garage to ask if she could use his bathroom; (4) shot Whitfield only after she feared for her life; (5) did not realize that she was running from police officers; and (6) only tried to leave the hospital room because she needed to use the bathroom.

Defendant was convicted and sentenced as stated above. Defendant now appeals.

## II. POLICE TESTIMONY

Defendant first argues that the trial court erred by allowing police officers, who testified as lay witnesses, to provide expert testimony that she appeared to be under the influence of controlled substances when she was arrested, which was speculation. We disagree.

### A. STANDARD OF REVIEW

"A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. However, whether a rule or statute precludes admission of evidence is a preliminary question of law that this Court reviews de novo." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017) (citation omitted). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). "[A] preserved nonconstitutional error is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *Denson*, 500 Mich at 396 (quotation marks and citation omitted).

### B. ANALYSIS

#### 1. ALLEGED STIPULATION

Defendant argues that the parties stipulated to not "get into substance use at trial" but the trial court did not accept that stipulation.

This argument misrepresents the following conversation that preceded jury selection:

[*Defense Counsel*]: Your Honor, there was reference to some suspicion within the context of certain witnesses statements to possible methamphetamine use in this case.

On behalf of [defendant], it is my understanding based on conversation we had in chambers that everyone is in agreement that at this point in time, the Court is suggesting to the prosecutor and to the defense, to not bring it up. However, if there is a situation in which it becomes relevant, the Court will ask the parties to address that outside the presence of the jury.

[*Prosecutor*]: That is the People's understanding as well, Your Honor. And we are hesitant to make a blanket agreement that we would not elicit any testimony whatsoever in regards to—to that potential evidence.

However, it was not our intention to bring it up just for the sake of bringing it up. We would only intend to do so if it became relevant in the context of other testimony.

Certainly we understand, however, given the nature of that type of evidence, that it certainly makes sense to do outside of the—or explore that outside the

presence of the jury, before eliciting any such testimony with—by surprise, in front of the jurors in this matter.

> [*Trial Court*]: All right. And counsel, I appreciate that also. I know we had discussions in chambers and sometimes it is easier to make rulings, obviously, as the Court is able to hear some testimony and so forth.
>
> So I've just cautioned everyone to please make sure that you discuss this matter with the witnesses. They are not to bring up any comments or testimony with regards to that. If there is an issue that needs to be addressed, we will have a bench conference or do it outside the presence of the jury and then I'll make my ruling and go from there.
>
> I can certainly see both sides that it might come in, it might not come in. But we will see how things pan out.

As shown, the prosecutor clearly stated that she was "hesitant to make a blanket agreement that we would not elicit any testimony whatsoever in regards to—to that potential evidence," and she reserved the right to bring it up "if it became relevant in the context of other testimony." And the trial court acknowledged that any such testimony would be accordingly dealt with outside the presence of the jury, if raised. Therefore, contrary to defendant's reading of this exchange, the parties did not stipulate to not "get into substance use at trial."

Regardless, a juror—not the prosecutor—was the first person to ask a question regarding whether defendant was under the influence of controlled substances during the incident. After apparently considering the question during a bench conference, the trial court stated on the record that it found that the question was relevant to defendant's behavior, appearance, and interactions, and might also pertain to her credibility. Therefore, the trial court did not err by "not accepting" the alleged stipulation, but instead adhered to the procedure that it announced would be followed.

2. SPECIFIC INSTANCES OF ALLEGED EXPERT OPINION TESTIMONIES

None of the officers in this case were qualified as expert witnesses pursuant to MRE 702, so MRE 701 governed the admissibility of each officer's testimony.

MRE 701,[4] which governs opinion testimony by lay witnesses, states as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) *rationally based on the perception of the witness* and (b) helpful to a clear

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

understanding of the witness' testimony or the determination of a fact in issue. [Emphasis added.]

"[T]he interplay between MRE 701 and MRE 702 is somewhat unclear when a police officer provides testimony based on his or her training and experience." *People v Dixon-Bey*, 321 Mich App 490, 497; 909 NW2d 458 (2017). For example, in *Chastain v Gen Motors Corp*, 254 Mich App 576, 586-587; 657 NW2d 804 (2002), a case involving a car accident, the trial court allowed a police officer to testify under MRE 701 that the plaintiff was not wearing a seat belt. The plaintiff argued that the officer's testimony should not have been admitted under MRE 701 because expert testimony pursuant to MRE 702 was necessary, and the officer was not qualified to give an expert opinion on the issue. *Id*. at 586-588. This Court concluded that the officer's testimony was admissible under MRE 701 because it was made on the basis of the officer's perceptions at the scene of the accident, not the officer's past experience in investigating car accidents. *Id*. at 588-590. This Court reasoned, "A careful examination of [the officer's] testimony establishes that although his opinion in this case was consistent with conclusions he had drawn in other cases he had investigated, his past experience did not form the basis of his opinion testimony." *Id*. at 590. However, this Court also concluded that the plaintiff correctly argued that, because the officer was not qualified as an expert witness, "his testimony about his past investigative experiences and how they related to his investigation of this accident was inadmissible on the basis that such testimony was collateral to the officer's lay opinion." *Id*. However, this Court determined that any error was harmless. *Id*.

In this case, defendant concedes that the officers' direct observations of defendant were admissible; however, defendant argues that parts of the officers' testimonies went beyond mere perceptions or observations and constituted expert opinion testimony. Defendant specifically argues that any officer testimony related to the following was improper: (1) the frequency that officers interacted with people under the influence of controlled substances, (2) the specificity that defendant appeared to be under the influence of a stimulant, and (3) the distinction between trauma responses and the effects of a controlled substance.

First, any error in allowing testimony related to the frequency that the officers interacted with people under the influence of controlled substances was harmless because it is common knowledge that police officers frequently interact with people under the influence of controlled substances. See *McHugh v Fitzgerald*, 103 Mich 21, 21; 61 NW 354 (1894) ("Allowing a witness to give an opinion on a matter of common knowledge or observation is harmless error."). Accordingly, any error regarding this testimony is not grounds for reversal. See *Denson*, 500 Mich at 396.

Second, the trial court did not err by admitting Officer Hogan's testimony that defendant appeared to be under the influence of a stimulant. Officer Hogan testified that he made this observation on the basis of his training and experience as a police officer; however, Officer Hogan also stated that defendant had "very big eyes and very dilated pupils. Kind of a thicker mucus on the side of her mouth and very repetitive speech pattern." In *Chastain*, 254 Mich App at 590, this Court reasoned that the officer's testimony was admissible under MRE 701 because "[a] careful examination of [the officer's] testimony establishe[d] that although his opinion . . . was consistent with conclusions he had drawn in other cases he had investigated, his past experience did not form

-6-

the basis of his opinion testimony." The same can be said in this case. Although Officer Hogan may have drawn similar conclusions in other cases, his actual observations of defendant led him to believe that she was under the influence of a stimulant.[5] Accordingly, such testimony was admissible under MRE 701. See *id*. at 588-590.

Third, regarding the distinction between trauma responses and the effects of a controlled substance, defense counsel asked Officer Hogan whether he had received "training about how people who have experienced trauma have physical side effects from that trauma," and he responded in the affirmative. On re-direct, the prosecutor asked Officer Hogan if he would have changed his observation that defendant was under the influence of controlled substances had he known that defendant had a gun pointed at her right before the officers chased and apprehended her. Officer Hogan said, "Not at all." A juror then wrote the following question: "In your experience, can you tell the difference between trauma and under the influence?" Officer Hogan said, "I believe I can." A juror also wrote the following question for Officer Vorik: "Would you say [defendant's] behavior was based more on drugs or trauma? Based on your professional experience?" Officer Vorik responded, "I would say drugs."

In *People v Allen*, 331 Mich App 587, 590; 953 NW2d 460 (2020), vacated in part on other grounds 953 NW2d 197 (2021), the defendant was convicted of felonious assault and assault with intent to commit great bodily harm less than murder for assaulting his wife. Two officers generally testified that (1) they had mental-health training related to how victims respond after traumatic experiences, and (2) the incident was traumatic for the victim. *Id*. at 607-609. On appeal, the defendant argued that defense counsel was ineffective for failing to object to such testimony because it bolstered the victim's testimony. *Id*. at 607. However, this Court concluded that any objection would have been futile because the officers' testimonies were admissible under MRE 701. *Id*. at 609. This Court reasoned as follows:

> [The officers'] opinions were based on their observations and training. Review of the record establishes that their testimony was rationally based on their perceptions of victims of trauma and was presumably helpful to provide the jury with a clear understanding of the victim's conduct. Additionally, their testimony was not a "technical or scientific" analysis. Rather, their understanding of trauma and crime victims was acquired through training and experience. [*Id*. (citation omitted).]

Similar to the officers' testimonies in *Allen*, the officers' testimonies in this case did not provide a technical or scientific analysis of defendant's behavior after the incident. Officer Hogan merely explained that he had training related to how victims respond after traumatic experiences,

---

[5] This point also serves to discredit defendant's argument that the officers were speculating when they testified that defendant appeared to be under the influence of controlled substances. In addition to this testimony from Officer Hogan, Officer Vorik testified that defendant was argumentative and "very erratic" throughout his entire interaction with her, and that she "made little to no sense." Thus, the officers' opinions were not based on speculation but the officers' own interactions with and observations of defendant.

and Officer Hogan and Officer Vorik both testified that their training and experience still led them to believe that defendant was under the influence of controlled substances. Therefore, the officers' testimonies were admissible under MRE 701. See *id*. Accordingly, defendant has not established an abuse of discretion regarding admission of the officers' testimonies.[6]

### 3. HARMLESS ERROR

Even if it was error to allow the officers' contested testimonies, defendant failed to demonstrate that the error would have been outcome-determinative. *Denson*, 500 Mich at 396. Defendant argues that because her defense to her conviction for assault with intent to do great bodily harm, MCL 750.84, was self-defense, allowing the officers to testify that she used controlled substances made it less likely that the jury would credit her testimony that she acted in self-defense. Defendant argues that the officers' testimonies allowed the jury to speculate that intoxication, not a reasonable fear of Whitfield, explained the shooting. However, it is clear from the record that defendant's credibility was harmed not because the jury heard that she appeared to be under the influence of controlled substances, but because defendant gave a series of incredible excuses for all of her actions on the day of the shooting. That is, given that defendant was simply not a credible witness, the jury was not going to credit her claim of self-defense even if it had not heard that she appeared to be under the influence of drugs. The trial court also stated that defendant's testimony attempting to explain her behavior on the day of the shooting did not make sense. Moreover, the trial court instructed the jurors that they must decide what the facts were, which witnesses they believed, and how important their testimonies were. The court also instructed the jury on how to assess witness credibility and that testimony from police officers "is to be judged by the same standards you use to evaluate the testimony of any other witness." "[J]urors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). See also *Weeks v Angelone*, 528 US 225, 234; 120 S Ct 727; 145 L Ed 2d 727 (2000). Therefore, defendant cannot show that the alleged error was outcome determinative. *Denson*, 500 Mich at 396.

### III. SENTENCING—UPWARD DEPARTURE

Defendant further argues that the trial court violated the principles of proportionality by sentencing defendant outside the recommended sentencing guidelines range because the court (1) departed from the guidelines range based on conduct that the guidelines already accounted for and (2) failed to justify the extent of the departure. We disagree.

---

[6] Defendant relies on *People v Unger*, 278 Mich App 210, 248; 749 NW2d 272 (2008), in support of her argument that "MRE 701 did not permit the officers to relay their assumptions about root causes of [her] behavior." This Court in *Unger* cited MRE 703 and stated, "An expert witness's opinion is objectionable if it is based on assumptions that do not accord with the established facts." *Unger*, 278 Mich at 248. However, as already stated, the officers in this case were not qualified as expert witnesses and MRE 701 governed the admissibility of each officer's testimony, so defendant's reliance on *Unger* is misplaced. Further, the officers did not make assumptions; instead, they formed opinions based on their own observations of defendant.

## A. PRESERVATION AND STANDARD OF REVIEW

"There are no special steps that a defendant must take to preserve the question whether the sentence was proportional . . . ." *People v Walden*, 319 Mich App 344, 350; 901 NW2d 142 (2017). "Further, there is no preservation requirement when the trial court imposes a sentence more severe than the sentencing guidelines recommend." *Id*. at 350-351. Therefore, defendant's issue is preserved for appellate review. See *id*.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). "[A]ppellate review of departure sentences for reasonableness requires review of whether the trial court abused its discretion by violating the principle of proportionality . . . ." *Id*. at 477. Instead of measuring proportionality by references to deviations in the guidelines, the Michigan principle of proportionality "requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 474 (quotation marks and citation omitted).

## B. ANALYSIS

Sentencing guidelines are advisory, not mandatory. *Lockridge*, 498 Mich at 399. "[A]lthough the guidelines can no longer be mandatory, they remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Id*. at 391. "Because the guidelines embody the principle of proportionality and trial courts must consult them when sentencing, it follows that they continue to serve as a 'useful tool' or 'guideposts' for effectively combating disparity in sentencing." *Dixon-Bey*, 321 Mich App at 524-525. However, under the principle of proportionality, "the key test is whether the sentence is proportionate to the seriousness of the matter, not whether it departs from or adheres to the guidelines' recommended range." *Steanhouse*, 500 Mich at 472 (quotation marks and citation omitted). "[T]he judge, of course, must take into account the nature of the offense and the background of the offender." *Id*. (quotation marks and citation omitted).

Three relevant factors are examined when determining whether a departure sentence is more proportionate than a sentence within the guidelines range: "(1) whether the guidelines accurately reflect the seriousness of the crime, (2) factors not considered by the guidelines, and (3) factors considered by the guidelines but given inadequate weight." *Dixon-Bey*, 321 Mich App at 525. These factors are not an exhaustive list of considerations—for example, "the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation" can all be considered. *Walden*, 319 Mich App at 352-353 (quotation marks and citation omitted).

Although a sentencing court may depart from the sentencing guidelines without a substantial and compelling reason to do so, it "must justify the sentence imposed in order to facilitate appellate review." *Lockridge*, 498 Mich at 391-392.

The requirement that the trial court justify the extent of the departure is not overly burdensome. The court need only reasonably comply with the statutory articulation requirement in order to facilitate appellate review . . . . [M]athematical precision in sentencing is neither required nor possible. Nonetheless, the difference between the sentence imposed based on a departure and the recommended minimum sentence range under the guidelines is relevant to the proportionality analysis. [*People v Smith*, 482 Mich 292, 298; 754 NW2d 284 (2008).]

In this case, defendant's sentencing guidelines recommendation for Count 1 was 19 to 38 months in prison; however, the trial court sentenced defendant to 66 to 120 months, reasoning as follows:

I don't blame [Whitfield] for being upset every time he came in here. I don't blame him for being upset with you. You just about killed him. He is so lucky to be here with us. Your behavior with the cops was app—was atrocious. Your running from the cops is atrocious. This whole scenario is just wrong on so many levels.

I don't think three years is appropriate for you.

* * *

I am going to sentence [defendant] to five and a half years to ten years. I know that is a little bit above the guidelines. I don't think that the factual—or the guidelines here take into the fact that this was a shooting at close range, according to the victim's testimony. Not only after you shot him, you kept shooting and he was talking about bullets whizzing by his head. I mean, by all accounts, he should be dead.

Your behavior, again, as indicated—it—I don't think the guidelines take into account there all of that. And I think under all of the circumstances, the Court believes it is appropriate to depart upward from the guidelines.

The extent of the injuries, everything, all of your actions on that particular day. So again, it is five and a half years to ten years.

Therefore, the trial court did not believe that the sentencing guidelines appropriately accounted for the following: (1) the extent of defendant's behavior toward police officers, (2) that defendant shot Whitfield at close range, (3) that defendant kept shooting even after Whitfield was hit, and (4) that Whitfield suffered serious injuries and could have died.[7]

---

[7] The trial court stated that it did not know if defendant "understood the ramifications" because defendant "almost killed [Whitfield]" and "sentenced him to a life of recovery."

In this case, Offense Variable (OV) 1 was assigned 25 points, reflecting that "[a] firearm was discharged at or toward a human being," and OV 2 was assigned 5 points, reflecting that defendant possessed a pistol, rifle, or shotgun. MCL 777.31 and MCL 777.32. Whitfield testified that he was shot three times by defendant on the upper right side of his chest while he was leaning over defendant, about a foot away from her. Whitfield further testified that after defendant shot him, he grabbed the barrel of the gun, and defendant continued shooting. Whitfield stated that had he not moved his head, the additional shots fired by defendant would have hit him under his jaw. Therefore, the OVs, as scored, clearly took into account defendant's use of a gun to shoot Whitfield. However, the trial court properly determined that the sentencing guidelines did not account for the seriousness of the fact that defendant fired *multiple* shots directly near Whitfield's head even after Whitfield was hit in the chest and seriously injured. See *Dixon-Bey*, 321 Mich App at 525.

Furthermore, OV 3 was assigned 10 points, reflecting that "[b]odily injury requiring medical treatment occurred to a victim," and OV 4 was also assigned 10 points, reflecting that "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.33 and MCL 777.34. Whitfield testified that following the shooting, he had to go to physical therapy and was not able to use his arm. Whitfield stated that after about four months, he tried to start working, and that his "arm collapsed again." He then had to return to physical therapy, and at the time of trial was still going to physical therapy because of the injuries to his shoulder.[8] Psychologically, Whitfield testified that being shot by defendant had made him feel terrible and "mentally tormented." On the day of the shooting, he had only been awake for about 10 minutes and never expected that when he let his dog outside to go to the bathroom, he was going to end up being shot multiple times. After being shot, Whitfield testified, "I thought my life was about to be gone." Whitfield further testified that listening to his 911 call in court gave him flashbacks to seeing his life flash before his eyes, he had become very hostile, and stated that paying for rides or not having rides to doctor appointments and physical therapy had been very frustrating for him. Whitfield also testified that he "messed [himself] up emotionally" by making a habit of going into his garage and studying the bullet holes in his garage ceiling caused by the shots defendant fired at Whitfield's head. Therefore, the OVs, as scored, clearly took into account the bodily and psychological injuries that Whitfield suffered. However, the trial court properly determined that the sentencing guidelines did *not* account for the fact that had one of the bullets that flew past Whitfield's head made contact, Whitfield's injuries would have been even worse and possibly led to death. See *Dixon-Bey*, 321 Mich App at 525. The guidelines also did not take into account the length of Whitfield's recovery and the ongoing difficulties that defendant's actions caused Whitfield. The trial court also appropriately reasoned that the guidelines did not adequately account for the extent of Whitfield's injuries, both physical and psychological.

Additionally, OV 19 was assigned 10 points, reflecting that defendant "interfered with or attempted to interfere with the administration of justice . . . ." MCL 777.49. Although OV 19 accounted for defendant's obstruction of justice by attempting to flee, the trial court reasonably determined that it did not accurately reflect the seriousness of defendant's ongoing resistance

---

[8] Whitfield testified that one of the bullets hit a shoulder blade and chipped it, a second bullet came out from his side, and a third bullet came out from under his armpit.

toward officers before *and* after arrest. See *Dixon-Bey*, 321 Mich App at 525. As previously mentioned, defendant not only fled from police when they initially tried to apprehend her, but also tried to escape from the hospital and then accused Officer Vorick of assaulting her. Officer Vorick testified that when he unhandcuffed defendant from the hospital bed and told her to put her shoes on for transport to the county jail, defendant began "speed walking out of the room and tried to go down a hallway in the hospital." Officer Vorick testified that he had to leave the hospital room, get defendant, and bring her back to the room. Officer Vorick further testified that defendant was uncooperative, argumentative, and was "flailing around" and moving about the hospital room while he was attempting to handcuff her. Once handcuffed, Officer Vorick testified that defendant resisted walking to the police vehicle and getting inside the vehicle. Officer Vorick stated that defendant refused to put her feet inside the vehicle, so another officer had to go around the vehicle to the other passenger side door and slide defendant into the vehicle so that the door could be shut. In addition, Officer Vorick testified that he had to repeat his commands four to six times before defendant would comply.

The trial court very clearly (1) justified its reasons for the departure; and (2) considered whether the guidelines accurately considered, and reflected, the seriousness of defendant's crime. Accordingly, the trial court provided adequate justifications to explain why the upward departure was proportionate to the seriousness of the matter. Therefore, considering the length of the departure, the evidence in the record, and the trial court's statements in support of the sentence, the trial court did not abuse its discretion, and the sentence imposed was both reasonable and proportionate.

Affirmed.

/s/ Noah P. Hood
/s/ Colleen A. O'Brien
/s/ James Robert Redford

-12-